[PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT
_____

No. 16-10324
_____

D.C. Docket No. 1:15-cv-00029-SCJ


In Re: Galectin Therapeutics, Inc. Securities Litigation,

MARISSA BALLESTEROS, et al.,

Plaintiffs,

GLYN HOTZ,
Lead Plaintiff,

Plaintiff - Appellant,

versus

GALECTIN THERAPEUTICS, INC.,
JAMES C. CZIRR,
PETER G. TRABER,
JACK W. CALLICUTT,
3:14-cv-402-RCJ-WGC,
ROD D. MARTIN,
JOHN F. MAULDIN, 10x FUND L.P.
Member Case 3:14-cv-402-RCJ-WGC, et al.,

Defendants - Appellees,

GILBERT F. AMELIO,
Member Case 3:14-cv-402-RCJ-WGC, et al.,

                                                  Defendants.

_____

Appeal from the United States District Court
for the Northern District of Georgia
_____

(December 15, 2016)

Before TJOFLAT and HULL, Circuit Judges, and BYRON,[*] District Judge.

HULL, Circuit Judge:

Appellee-defendant Galectin Therapeutics, Inc. ("Galectin") is a small biopharmaceutical company headquartered in Norcross, Georgia. On February 26, 2014, Appellant-plaintiff Glynn Hotz purchased 16,000 shares of Galectin common stock at $17.90 per share. On July 25, 2014, news outlets began to report that Galectin had paid promotional firms to write flattering articles about Galectin and to "tout" Galectin's stock price. On July 28, 2014, Galectin's stock price crashed. Galectin's stock lost over half its value, falling from a price of $15.91 per share to $7.10 per share in one day.

---

[*]Honorable Paul G. Byron, United States District Judge, for the Middle District of Florida, sitting by designation.

After suffering stock losses, Hotz filed a consolidated class action complaint against Galectin on May 8, 2015. Hotz now appeals the district court's Rule 12(b)(6) dismissal of his complaint for failure to state a claim.

This appeal involves two causes of action. First, Hotz alleges that Galectin, along with several of its officers and directors, committed securities fraud in violation of § 10(b) of the Securities and Exchange Act of 1934 (the "Exchange Act") and implementing Rule 10b-5(b). There is no allegation that the articles were false. Rather, Hotz argues that Galectin made material misstatements and omissions of fact by not disclosing that it had paid the promotional firms to tout Galectin stock. Second, Hotz alleges that certain Galectin officers and directors were liable for the company's actions in their personal capacity as "controlling persons" of Galectin under § 20(a) of the Exchange Act.

After thorough review, and with the benefit of oral argument, we affirm.

## I.  BACKGROUND

Because this appeal involves a Rule 12(b)(6) dismissal, we outline in detail the allegations in the complaint.

### A.     The Parties

Plaintiff Glynn Hotz represents the putative class of similarly situated Galectin shareholders. The Class Period runs from October 24, 2013 to July 28, 2014. The defendants are: (1) Galectin Therapeutics, Inc. ("Galectin") and 10X

3

Fund L.P. (the "10X Fund"), and; (2) five individuals, James C. Czirr ("Czirr"), Rod D. Martin ("Martin"), Peter G. Traber ("Traber"), Jack W. Callicutt ("Callicutt"), and John F. Mauldin ("Mauldin").

Galectin conducts protein research in an effort to combat cancer and non-alcoholic steatohepatitis ("NASH"), or "fatty liver disease." Galectin has been developing GR-MD-02 ("the drug") as its lead drug to combat NASH.

## B.    Pro-Pharma

Galectin first began as a business under a different name—Pro-Pharmaceuticals, Inc. ("Pro-Pharma"). From 2003 to 2011, Pro-Pharma developed a separate drug, Davanat. Pro-Pharma designed Davanat to improve the effectiveness of certain colon cancer chemotherapy treatments. Pro-Pharma struggled to obtain Food and Drug Administration ("FDA") approval of Davanat throughout its development.

In 2008, defendants Czirr and Martin co-founded defendant 10X Fund as a technology-focused hedge fund, headquartered in Niceville, Florida. In 2009, the 10X Fund conducted a takeover and restructuring of the struggling Pro-Pharma. In 2011, Pro-Pharma changed its name to Galectin and phased out the Davanat study. Galectin did this in an attempt to revamp its image. In 2013, Galectin began development of the GR-MD-02 drug.

**C.    Galectin's Stock**

During the October 24, 2013-July 28, 2014 Class Period, Galectin remained a small company. It faced pressure to compete from rival biotechnology firms. Before Galectin began its GR-MD-02 development, competitor Intercept Pharmaceuticals ("Intercept") had already submitted a similar drug for FDA approval. Over a one-month period in January 2013, Intercept's stock price had skyrocketed from $20 per share to $445 per share.

During the Class Period, the five individual defendants—Czirr, Martin, Traber, Callicutt, and Mauldin—served as directors and senior officers of Galectin. Within this period, each individual defendant allegedly exercised control over— and held a financial interest in—Galectin. Each individual defendant also owned various shares of Galectin common stock. As of March 2015, each individual defendant owned the following approximate number of shares: Czirr—817,000 shares; Martin—175,000 shares; Traber—1,405,276 shares; Callicutt—99,035 shares; Mauldin—53,662 shares.

Apart from these individual owners, as of March 2015, the 10X Fund owned "all of the issued and outstanding shares of Galectin Series B preferred stock, which are convertible into 2,000,000 shares of Galectin's common stock, as well as

5

warrants exercisable to purchase an aggregate of 4,000,000 shares of Galectin common stock."[1]

Separately, according to Hotz's complaint, the 10X Fund had the right "at all relevant times" to elect three Galectin directors in a class vote and to nominate three directors for election. The 10X Fund had these rights by virtue of its ownership of Galectin preferred stock. The complaint does not allege that the 10X Fund ever exercised these rights.

## D.    Galectin's Two "ATM" Offerings

Because Galectin was developing drugs pending FDA approval, Galectin did not generate revenues during the Class Period. Instead, Galectin financed its research and production operations through stock and debt issuances.

Between 2013 and 2014, Galectin announced two issuances of common stock "for the continued development of [its] drug research and development programs, including the current clinical trial for GR-MD-02." Galectin announced the offerings on October 25, 2013 and March 21, 2014, respectively. In each

---

[1]After describing each defendant's ownership of Galectin stock, Hotz's complaint alleges that the defendants "[b]y reason of their control of Galectin . . . control the day-to-day conduct of Galectin's business and are liable for any false and misleading statements and omissions alleged herein that are attributable to Galectin." However, the complaint does not allege that the defendants collectively owned a majority stake in Galectin common stock during the Class Period. Indeed, the complaint fails to allege any percentage of Galectin common stock collectively owned by the defendants during the Class Period. The complaint's only factual allegation concerning the percentage of ownership in Galectin is that, "as of December 31, 2014 [assuming exercise of all outstanding stock options] . . . the 10X Fund would own approximately 31% of Galectin's then-outstanding shares of common stock."

issuance, Galectin authorized the sale of up to $30 million in shares in an "at the market" ("ATM") agreement, wherein Galectin could sell shares at its sole discretion.

In the first ATM offering, Galectin sold 2,763,589 shares of common stock. The sale generated net proceeds of approximately $29,011,000. For the period of October 25, 2013 through December 31, 2013, Hotz's complaint alleged an average sale price of $9.02 per share from the first ATM offering. Hotz's complaint did not allege a final average price per share from the first ATM offering, which concluded in February 2014. Hotz's complaint also did not allege sales figures from the second ATM offering that Galectin announced on March 21, 2014.

### E.    The Stock Promoters

While Galectin was making these ATM offerings, it allegedly retained several promoters to "recommend or 'tout'" Galectin's stock and raise the stock price. Galectin worked with four promoters: (1) The Dream Team/Mission IR ("The Dream Team"); (2) Patrick Cox; (3) TDM Financial/Emerging Growth Corporation ("TDM"), and; (4) Acorn Management Partners, LLC ("Acorn").

All four stock promoters frequently published articles about stocks and investments. There is no Securities and Exchange Commission ("SEC") rule

7

requiring a company (like Galectin) to disclose that it pays a stock promoter for promotional material.

Rather, the duty to disclose payments for promotional articles is on the author who receives the payment. See 15 U.S.C. § 77q(b). This way, the payment disclosure will be right in the article itself. Specifically, § 17(b) of the Securities Act of 1933 (the "Securities Act") requires stock promoters to disclose any payment they receive as consideration for their promotional material. See id. In Hotz's complaint, there is no claim brought against the promoters themselves for failure to disclose the receipt of any such payments from Galectin. But, as outlined below, there are allegations that two of the promoters did not disclose their payments.

## F.     The Dream Team and Cox Did Not Disclose Payments

One promoter was The Dream Team. Between the fall of 2012 and December 2014, The Dream Team published seven articles touting Galectin and its stock with titles such as, "Investors Should Consider Galectin Therapeutics (GALT)." Galectin paid The Dream Team for these articles, but The Dream Team's articles did not disclose the payments. Galectin did not disclose that it paid The Dream Team.

A second promoter was Patrick Cox. During the Class Period, Cox

8

wrote twenty-three articles about Galectin and its drug development. Galectin paid Cox for these articles, but Cox's articles did not disclose the payments, and Galectin did not disclose them either.

Further, before Hotz filed his complaint, Cox denied that he had ever received any payment from Galectin. On July 29, 2014, Cox wrote an open letter to the readers of the Transformational Technology Alert, a newsletter Mauldin owned. In the letter, Cox wrote that "neither I nor the analyst team has ever had any direct or indirect financial arrangement with Galectin Therapeutics."[2]

## G.    TDM and Acorn Disclosed Payments

The other two stock promoters were TDM and Acorn, who did disclose their payments from Galectin. On its website, TDM wrote and published six articles about Galectin during the Class Period. Galectin paid TDM for the articles, but Galectin did not disclose that it paid TDM.

---

[2]Hotz also alleges that, before the Class Period, Cox and Galectin management had a preexisting fraudulent relationship. In March 2011, defendant Mauldin independently employed Cox to write a research article on BioTime, a small biotechnology company. Mauldin owned shares in BioTime. Cox published the research article in the Tranformational Technology Alert. The article caused BioTimes's shares to jump 14% the day the article was published.

There is no allegation, however, that either Cox or Mauldin failed to disclose payment from Cox to Mauldin for the BioTime article. Or, rather, Hotz includes the BioTime episode to suggest that Cox and a Galectin director (Mauldin) enjoy a "deep-rooted relationship." Hotz suggests that this relationship could have led Cox to be "easily . . . manipulated" during the Class Period.

TDM, however, made two disclosures that Galectin paid it for services. First, at least one of the TDM articles included a "[F]ull [D]isclaimer" link at the bottom of the article. If a user clicked the "[F]ull [D]isclaimer" link, he or she would be taken to a separate "Legal Disclaimer" webpage. On the "Legal Disclaimer" webpage, TDM listed Galectin as a paying client and showed receipt of eleven separate payments from Galectin. The payments from Galectin to TDM on the "Legal Disclaimer" webpage ranged from $3,500 to $7,000 each. TDM's disclosure did not describe what each payment was for.

Second, in a "Case Studies" section on its website, TDM stated that Galectin paid it to promote Galectin's stock and "to broaden and enhance [Galectin's] shareholder base . . . through a combination of dedicated list mailings, targeted content syndication, and other forms of measurable and effective outreach."

Hotz charged that TDM's disclosure was "minimal" and so difficult to find—whether in TDM's articles or on its website—that TDM's disclosure was ineffective in stopping the defendants' stock-promotion scheme.

The fourth promoter was Acorn. During the Class Period, Acorn published two promotional articles about Galectin, including a March 10, 2014 "Company Profile" detailing the drug's "blockbuster potential" and Galectin's competitiveness with Intercept. Galectin paid Acorn for these articles, and Acorn made disclosures. Acorn disclosed that its March 10, 2014 Company Profile

10

"should be viewed as a paid advertisement, to enhance the public awareness of Galectin Therapeutics (Nasdaq: GALT) and its securities."

Galectin itself did not disclose that it paid Acorn to write and publish the articles, even though Galectin did disclose that it paid Acorn for unspecified business services.

On May 13, 2014, Galectin filed an SEC Form 10-Q financial report. In the report, Galectin disclosed that it paid Acorn 3,000 shares of common stock as part of a "consulting agreement." The disclosure did not provide details about what the consulting agreement was for.

According to Hotz, the "consulting agreement" language was: (1) untimely, appearing two months after Acorn's March 10, 2014 Company Profile, and; (2) too vague to be considered as Galectin's disclosure that it paid Acorn to write and publish the promotional articles.

## H.    The Promotional Scheme

According to the complaint, the stock promoters timed the publication of their Galectin-related articles to coincide with Galectin's own press releases and "pump" Galectin's stock price. Following the publication of the flattering articles, defendant Galectin made the two ATM offerings to "[c]apitaliz[e] on the artificially inflated price of its common stock" and minimize the dilution of the defendants' "investment" in Galectin.

11

Hotz's complaint offers several examples of "market timing." First, on January 13, 2014, Galectin filed an SEC Form 8-K which discussed Galectin's competitiveness with Intercept. On January 28, 2014, TDM published an article which stated that, "if conclusions are to be drawn so early in the game, it's arguable that Intercept's peer Galectin Therapeutics may actually have a better NASH/fibrosis drug in GR-MD-02."

Second, on March 21, 2014, Galectin made its second ATM offering. On March 27, 2014, TDM published an article which described Galectin as "only a clinical data set away from a potential leap forward with GR-MD-02."

Third, on July 24, 2014, a TDM article discussed how Galectin was "nipping at Intercept's heels." The next day, Galectin issued a press release, announcing that it would soon present results from its latest drug study.

Whether due to the articles or not, Galectin's stock price increased during the drug's development cycle. When Galectin announced the beginning of its drug development program in January 2013, Galectin stock was trading at roughly $2 per share. By the time Galectin made its first ATM offering in October 2013, Galectin's stock had risen to "an all-time high of $12.45 per share." This price continued to climb to $15.31 per share by the time of Galectin's second ATM offering in March 2014.

Notably, there is no allegation that the defendants pumped the stock price and then sold it, which is called a "pump-and-dump" scheme. Rather, and as previously mentioned, Hotz claims the defendants pumped the stock price in order to minimize the dilution of their "investment" in Galectin when Galectin raised capital through its two ATM offerings.

## I.    Galectin's Stock Collapse

In late July 2014, several months after Galectin's second ATM offering, investment commentators began publishing articles and messages regarding suspected ties between Galectin and the stock promoters. The messages charged promotional touting; some included language such as, "[Galectin] paying penny stock promoters to issue misleading PRs" and "[o]nly someone being paid to shill would claim Galectin is 'nipping at Intercept's heels.'" On July 28, 2014, after the investment commentators published these articles and messages, Galectin's stock price began to fall. Over a one-day period from July 28, 2014 to July 29, 2014, Galectin's stock price fell from $15.91 per share to $7.10 per share, generating a loss of $8.81 per share (a 55% loss in the stock price).

The stock-price crash was a market reaction to the "revelation" of a stock-promotion scheme. Hotz alleges that, had Galectin disclosed its promoter relationships from the start, he and other class members would not have purchased

13

the stock. As it was, Hotz and other class members purchased the stock during the Class Period and suffered losses resulting from the stock price's decline in value.

**J.    Galectin's Representations in its ATM Offerings**

In both the October 25, 2013 and March 21, 2014 ATM offerings, Galectin stated that it had not taken any action that caused or resulted in the "manipulation" of its stock price, as follows:

> Neither the Company, nor any Subsidiary, nor any of their respective directors, officers or controlling persons has taken, directly or indirectly, any action designed, or that has constituted or would reasonably be expected to cause or result in, under the Exchange Act or otherwise, the stabilization or manipulation of the price of any security of the Company to facilitate the sale or resale of the placement shares.

In those ATM offerings, Galectin also stated that it would not "directly or indirectly" manipulate its stock price in the future. Galectin publicly disseminated these assurances in its October 24, 2013 and March 21, 2014 SEC filings.

According to Hotz, Galectin broke this "no manipulation" promise because it "engaged in conduct designed to manipulate the price of its securities in order to generate capital with as little dilution as possible." Further, Galectin had hired stock promoters to "(i) embellish[] the putative effectiveness of GR-MD-02 . . . and (ii) overstat[e] Galectin's competitiveness with its so-called 'peer' Intercept."

14

In sum, Hotz's complaint alleges that the defendants' representation that they had not manipulated the stock price was false and actionable because: (1) the defendants paid promoters to tout the stock, and; (2) the defendants then were able to raise capital at higher stock prices to prevent dilution of their own "investments" in Galectin.[3]

**K.    Galectin's Omissions in SEC Form 10-K and 10-Q Reports**

In addition to the "no manipulation" representations in the ATM offerings, Hotz's complaint faults the defendants for omitting that Galectin paid promoters when Galectin filed its SEC Form 10-K and 10-Q reports that described the results of its October 25, 2013 ATM offering. We set forth the complaint's allegations about those reports.

On November 12, 2013, Galectin filed an SEC Form 10-Q report. That quarterly report stated that Galectin, at that point, had issued 50,643 shares of common stock from the October 25, 2013 ATM offering. This sale had raised net proceeds of "approximately $531,000" at "an average price of $10.82 per share."

On March 21, 2014, Galectin filed an SEC Form 10-K report. That annual report provided updated and final sales figures as to the same October 25, 2013

---

[3]In response to the defendants' motion to dismiss, Hotz states, "Plaintiff does not challenge under § 10(b) a single substantive statement in the Stock Promoters' articles." Hotz also states, "Plaintiff's claims are not premised on the actual statements made in the Stock Promoters' articles."

ATM offering. The 10-K report stated that, as of December 31, 2013, Galectin had issued 99,942 shares from the October 25, 2013 ATM offering at an average price of $9.02 per share, resulting in net proceeds of approximately $944,000. The 10-K report also stated that, in January and February 2014, Galectin had issued an additional 2,663,647 shares from the October 25, 2013 offering, resulting in additional net proceeds of approximately $28,178,000. The January and February 2014 issuances had "completed the At Market Agreement."

On May 13, 2014, Galectin filed an SEC Form 10-Q report. That quarterly report provided the same final sales figures for the October 25, 2013 ATM offering as those provided in the March 21, 2014 annual 10-K report.

Hotz's complaint alleges that these reports failed to disclose "that Galectin had raised the above funds by secretly hiring the stock promoters to publish highly exaggerated and manipulative articles." Hotz's complaint also alleges that failing to disclose the use of stock promoters constituted a material omission in the reports, in violation of the securities laws.

## L.    Claim that Stock Promoters Are Agents of Galectin

As mentioned, § 17(b) of the Exchange Act requires stock promoters to disclose any consideration that they receive in exchange for their promotional material. 15 U.S.C. § 77q(b). Because Galectin paid the stock promoters to write the articles, Hotz's complaint alleges that the stock promoters became the "agents

16

of the Company," and that Galectin itself therefore assumed the stock promoters' disclosure responsibilities.

Because the stock promoters' articles did not disclose that Galectin paid for their publication, Hotz's complaint alleges that these articles were materially misleading. Accordingly, Hotz's complaint alleges that the defendants violated the securities laws by "recklessly disregarding" the material omissions of their agents.

## M.    Procedural History

On July 30, 2014, prior to this litigation, Marissa Ballesteros filed a complaint, individually and on behalf of others similarly situated, in the United States District Court for the District of Nevada against Galectin, Czirr, Traber, and Callicutt, alleging violations of §§ 10(b) and 20(a) of the Exchange Act. Hotz was a putative class member in this action by virtue of his purchase of Galectin stock during the putative Class Period.

On August 21, 2014, the parties in the Nevada case stipulated to consolidate that action with two other putative securities class actions brought by Galectin shareholders against the same defendants. On August 22, 2014, the District Court of Nevada issued an order consolidating the cases under the caption, "In re Galectin Therapeutics, Inc. Securities Litigation."

On September 29, 2014, Hotz filed a Motion for Appointment as Lead Plaintiff in the District of Nevada. Hotz claimed he was the "most adequate plaintiff" for the class because his monetary loss during the Class Period represented the largest known financial interest in the relief sought by the class.

On September 3, 2014, before Hotz had filed this motion for Appointment as Lead Plaintiff, defendants Galectin, Czirr, Traber, and Callicutt had separately filed a motion in the District of Nevada to transfer the consolidated class action to the Northern District of Georgia. On January 5, 2015, before ruling on Hotz's Motion for Appointment as Lead Plaintiff, the District Court of Nevada granted the defendants' motion to transfer and transferred the case to the Northern District of Georgia.

On March 24, 2015, the Northern District of Georgia granted Hotz's Motion for Appointment as Lead Plaintiff that he had filed in the District of Nevada. The Northern District of Georgia issued a schedule allowing Hotz forty-five days to file a consolidated complaint against the defendants, which Hotz did.

On May 8, 2015, Hotz filed the consolidated class action complaint here, which includes three counts. In Count I, Hotz alleges that defendants Galectin, Callicutt, and Traber misrepresented that they had not acted to manipulate Galectin's stock price, in violation of § 10(b) of the Exchange Act and Rule 10b-5(b).

In Count II, Hotz alleges that defendants Galectin, Czirr, Martin, Traber, Callicutt, and Mauldin defrauded the market by paying for a stock-promotion scheme without disclosing that scheme, in violation of § 10(b) of the Exchange Act and Rules 10b-5(a) and (c).

In Count III, Hotz alleges that defendants Czirr, Martin, Traber, Callicutt, Mauldin, and the 10X Fund are each liable in an individual capacity for Galectin's material omissions and misrepresentations, in violation of § 20(a) of the Exchange Act. This is a claim of derivative liability, alleging that defendants Czirr, Martin, Traber, Callicutt, Mauldin, and the 10X Fund are "controlling persons" of Galectin by virtue of their positions in Galectin's corporate structure and participation in its day-to-day operations.

## N.    District Court's Order

On June 26, 2015, the defendants moved to dismiss Hotz's complaint for failure to state a claim. On December 30, 2015, the district court granted the motion.

As to Count I, the district court determined that Galectin did not materially mislead investors by failing to disclose defendants' payment to the stock promoters. First, the district court noted that paying for promotional articles does not constitute price "manipulation." The district court ruled that, because it is permissible to use stock promoters, the defendants did not impermissibly

19

manipulate the company's stock price. Therefore, the defendants did not contradict themselves when they publicly represented that they had not manipulated Galectin's stock price.

Second, under interpretive Supreme Court law, the defendants did not make, and are not liable for, the stock promoters' own statements. Relying on Janus Capital Group, Inc. v. First Derivative Traders, the district court reasoned that one must "make" a material misstatement or omission in order to be liable for that misstatement or omission under the securities laws. 564 U.S. 135, 141, 131 S. Ct. 2296, 2301 (2011). According to the district court, the defendants' mere payment to the stock promoters was "insufficient" to suggest that, under Janus, Galectin "made" the statements in the stock promoters' articles. Therefore, the district court dismissed Count I.

As to Count II, the district court determined that Hotz's complaint failed to allege conduct different from that in Count I. Because this alleged conduct—making payments to promoters—was clearly permissible under Rules 10b5-(a) and (c), the district court dismissed Count II. In this appeal, Hotz does not challenge the district court's Count II ruling.

As to Count III, the district court dismissed Hotz's § 20(a) derivative claim because the lack of liability under § 10(b) of the Exchange Act could leave "no secondary liability under section 20(a)."

20

Hotz appeals the district court's ruling as to his § 10(b) and Rule 10b-5(b) claims in Count I and his § 20(a) claims in Count III.[4]

## II.  DISCUSSION

### A.    Pleading Requirements for a Rule 10b-5(b) Claim

To survive a motion to dismiss, a claim brought under Rule 10b–5(b) must satisfy: (1) the federal notice pleading requirements in Federal Rule of Civil Procedure 8(a)(2) ("Rule 8(a)(2)"); (2) the special fraud pleading requirements in Federal Rule of Civil Procedure 9(b) ("Rule 9(b)"), and; (3) the additional pleading requirements in the Private Securities Litigation Reform Act of 1995 ("PSLRA"). See Phillips v. Scientific–Atlanta, Inc., 374 F.3d 1015, 1016 (11th Cir. 2004) (reviewing a Rule10b-5(b) claim for a company's alleged exaggeration of product demand); Ziemba v. Cascade Int'l, Inc., 256 F.3d 1194, 1197, 1202 (11th Cir. 2001) (reviewing a Rule 10b-5(b) claim for a company's alleged misrepresentation of its profits).

Under Rule 8(a)(2), a complaint must contain "a short and plain statement of the claim showing that the pleader is entitled to relief." Fed. R. Civ. P. 8(a)(2). The complaint must allege "enough facts to state a claim to relief that is plausible on its face," and the factual allegations "must be enough to raise a right to relief above

---

[4]We review de novo the district court's order dismissing a complaint. Garfield v. NDC Health Corp., 466 F.3d 1255, 1261 (11th Cir. 2006). In deciding a Rule 12(b)(6) motion, "all well-pleaded facts are accepted as true, and the reasonable inferences therefrom are construed in the light most favorable to the plaintiff." Id. (quoting Bryant v. Avado Brands, Inc., 187 F.3d 1271, 1273 n.1 (11th Cir. 1999)).

21

the speculative level." Bell Atl. Corp. v. Twombly, 550 U.S. 544, 555, 570, 127 S. Ct. 1955, 1965, 1974 (2007).

In addition to the Rule 8(a)(2) requirements, Rule 9(b) requires that, for complaints alleging fraud or mistake, "a party must state with particularity the circumstances constituting fraud or mistake," although "[m]alice, intent, knowledge, and other conditions of a person's mind may be alleged generally." Fed. R. Civ. P. 9(b). While Rule 9(b) does not abrogate the concept of notice pleading, it plainly requires a complaint to set forth: (1) precisely what statements or omissions were made in which documents or oral representations; (2) the time and place of each such statement and the person responsible for making (or, in the case of omissions, not making) them; (3) the content of such statements and the manner in which they misled the plaintiff, and; (4) what the defendant obtained as a consequence of the fraud. Garfield v. NDC Health Corp., 466 F.3d 1255, 1262 (11th Cir. 2006); Ziemba, 256 F.3d at 1202. The "[f]ailure to satisfy Rule 9(b) is a ground for dismissal of a complaint." Corsello v. Lincare, Inc., 428 F.3d 1008, 1012 (11th Cir. 2005) (per curiam).

The PSLRA imposes additional heightened pleading requirements for Rule 10b–5(b) actions. For Rule 10b–5(b) claims predicated on allegedly false or misleading statements or omissions, the PSLRA provides that "the complaint shall specify each statement alleged to have been misleading, the reason or reasons why

the statement is misleading, and, if an allegation regarding the statement or omission is made on information and belief, the complaint shall state with particularity all facts on which that belief is formed." 15 U.S.C. § 78u–4(b)(1). And for all private Rule 10b–5(b) actions requiring proof of scienter, "the complaint shall, with respect to each act or omission alleged to violate this chapter, state with particularity facts giving rise to a strong inference that the defendant acted with the required state of mind [i.e., scienter]." Id., § 78u–4(b)(2). Although factual allegations may be aggregated to infer scienter, scienter must be alleged with respect to each defendant and with respect to each alleged violation of the statute. Phillips, 374 F.3d at 1016–18. If these PSLRA pleading requirements are not satisfied, the court "shall" dismiss the complaint. 15 U.S.C. § 78u–4(b)(3)(A).

## B.    General Legal Principles

"Section 10(b) of the Securities and Exchange Act of 1934 and the Securities and Exchange Commission's Rule 10b-5 prohibit making any material misstatement or omission in connection with the purchase or sale of any security." Halliburton Co. v. Erica P. John Fund, Inc., 134 S. Ct. 2398, 2407 (2014). Rule 10b-5(b) prohibits the making of any "untrue statement of a material fact" in connection with the purchase or sale of securities, as follows:

> It shall be unlawful for any person, directly or indirectly, by the use of any means or instrumentality of interstate commerce, or of the mails or of any facility of any national securities exchange,

23

. . . .

(b) To make any untrue statement of a material fact or to omit to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading . . .

. . . .

in connection with the purchase or sale of any security.

17 C.F.R. § 240.10b-5.

The Supreme Court has "long recognized an implied private cause of action to enforce the provision and its implementing regulation." Halliburton, 134 S. Ct. at 2405, 2407 (reviewing a Rule 10b-5(b) claim against the defendant for failure to disclose potential litigation costs and the expected revenue from certain contracts in public filings). To recover under Rule 10b-5(b), the plaintiff must prove: "(1) a material misrepresentation or omission by the defendant; (2) scienter; (3) a connection between the misrepresentation or omission and the purchase or sale of a security; (4) reliance upon the misrepresentation or omission; (5) economic loss, and; (6) loss causation." Id. at 2407 (quotation omitted).

## C.    "Maker" of a Statement Under Janus

In part, Hotz claims that the defendants committed securities laws violations not by virtue of their own statements, but rather based upon the statements of the third-party stock promoters in their articles. Before addressing Hotz's other claims

24

here, we note the Supreme Court's treatment of whether, under Rule 10b-5(b), a company (Galectin) can be held liable for the false statement of a third party (the stock promoters).

Janus concerned statements in a prospectus made by the Janus Investment Fund ("the Fund"), a mutual fund. Janus Capital Group ("JCG") had created the Fund and had a wholly owned subsidiary, Janus Capital Management ("JCM"). These were all separate legal entities throughout all relevant periods of the case. Janus, 564 U.S. at 138, 131 S. Ct. at 2299-2300. In return for service fees, JCM provided advice and management services to the Fund. Id. at 138-140, 131 S. Ct. at 2299-2300. The Fund compensated JCM with fees calculated as a percentage of the Fund's net value. Id.

In 2002, the Fund filed public prospectuses stating that its fund was "not intended for market timing or excessive trading."[5] Id. at 139, 131 S. Ct. at 2300. The Fund's prospectuses also indicated that "[JCG and JCM] would implement

---

[5]Market timing is "a trading strategy that exploits time delay in mutual funds' daily valuation system." Janus, 564 U.S. at 139 n.1, 131 S. Ct. 2300 n.1. The price of a mutual fund's shares is ordinarily determined by a calculation that "usually happens once a day, at the close of most major U.S. markets." Id. A market-timing investor will make trades to exploit the differences in value between a mutual fund's calculated daily share price and the true value of its underlying assets, which may fluctuate at various times throughout the day. Id. For a more complete discussion, see Janus Capital Group, Inc. v. First Derivative Traders, 564 U.S. 135, 139 n.1, 131 S. Ct. 2296, 2300 n.1 (2011), and Disclosure Regarding Market Timing and Selective Disclosure of Portfolio Holdings, 68 Fed. Reg. 70402 (proposed Dec. 17, 2003) (to be codified at 17 C.F.R. pts. 239, 274). There is no allegation of market timing in this case.

25

measures to curb market timing in the Janus [mutual funds]." Id. at 139-40, 131 S. Ct. at 2299-2300.

In 2003, the Attorney General of the State of New York filed a complaint alleging that JCG and JCM had in fact entered into secret negotiations to permit market timing in funds managed by JCM. Id. at 139, 131 S. Ct. at 2300. The negotiations allegedly included discussion of permitting market timing in the Fund. Id.

While market timing is otherwise legal, this activity, if true, would have contradicted the Fund's prospectus disclosure that JCG and JCM were combating market timing. Id. at 139-40, 131 S. Ct. at 2299-2300. Therefore, investors allegedly pulled their money from the Fund once they learned that the Fund was likely participating in this kind of activity. Id. at 139, 131 S. Ct. at 2300. These monetary withdrawals lowered the value of the Fund, which in turn reduced the amount of fees paid to JCM. Id. And since JCM is a wholly owned subsidiary of JCG, the reduced fees coming in to JCM also lowered JCG's revenues. Id. at 139-40, 131 S. Ct. at 2299-2300.

Shortly after the filing of the New York state complaint, JCG's stock price fell nearly twenty-five percent. Id. at 140, 131 S. Ct. at 2300.

A representative of a class of JCG shareholders (the "shareholder representative") then filed suit against defendants JCG and JCM for violations of

26

§ 10(b) of the Exchange Act and Rule 10b-5(b). Id. The shareholder representative alleged that: (1) JCG and JCM were "significantly involved" in preparing the Fund's prospectuses, and; (2) therefore, JCG and JCM effectively "made" the statements appearing in the Fund's prospectuses. Id. at 147-48, 131 S. Ct. at 2305. The shareholder representative alleged that JCG and JCM were liable for the statements in the Fund's prospectuses, which misrepresented that JCG and JCM would combat market timing. Id. at 139-40, 131 S. Ct. at 2300-01.

The Fourth Circuit held that the shareholder representative "had sufficiently alleged that 'JCG and JCM, by participating in the writing and dissemination of the prospectuses [of the Fund], made the misleading statements contained in the [Fund] documents.'" Id. at 141, 131 S. Ct. at 2301 (quotation omitted).

Reversing, the Supreme Court held that the defendants JCG and JCM were not the "makers" of the statements in the Fund's prospectuses. The Supreme Court concluded that, "[f]or purposes of Rule 10b-5, the maker of a statement is the person or entity with ultimate authority over the statement, including its content and whether and how to communicate it." Id. at 142, 131 S. Ct. at 2302. "Without control, a person or entity can merely suggest what to say, not 'make' a statement in its own right." Id. Thus, one who even "prepares or publishes a statement on behalf of another is not its maker." Id.

Applying this Rule 10b-5 "statement-maker" test, the Supreme Court reversed the Fourth Circuit's decision, effectively reinstating the district court's order of dismissal of the § 10(b) and Rule 10b-5(b) claims against defendants JCG and JCM. Although JCG and JCM maintained a "well-recognized and uniquely close relationship" with the Fund as "its investment adviser," the Supreme Court concluded that the shareholder representative failed to allege sufficiently that JCG or JCM had "made" the statements in the Fund's prospectuses. Id. at 145, 147-48, 131 S. Ct. at 2303-05. Neither JCG nor JCM "filed the prospectuses," nor had the shareholder representative shown that any prospectus language "came from [JCG and JCM] rather than Janus Investment Fund." Id. at 147, 131 S. Ct. at 2305. Therefore, even if the defendants JCG and JCM assisted the Fund in crafting those statements, "this assistance, subject to the ultimate control of Janus Investment Fund, [did] not mean that [JCG and JCM] 'made' any statements in the prospectuses." Id. at 148, 131 S. Ct. at 2305.

To the extent that Hotz bases his Rule 10b-5(b) claim on the content of, or the omissions in, the articles by the stock promoters, the Supreme Court has foreclosed that claim. The Supreme Court has held that a defendant must have "made" the statement to be liable for a violation of Rule 10b-5(b). Id. at 141, 131 S. Ct. at 2301. While Hotz has set forth allegations that the defendants worked in conjunction with stock promoters to promote Galectin's stock, particularly with

28

respect to the timing of articles by the stock promoters and company press releases, Hotz has not included sufficient allegations to support a finding that Galectin had "ultimate authority" or "control" over the stock promoters' statements. Id. at 142, 131 S. Ct. at 2302. Even though Galectin paid for the stock promoters' articles, that is not sufficient to support a claim under Rule 10b-5(b). See id. at 148, 131 S. Ct. at 2305. Payment for the promotional articles does not mean that Galectin is the maker of the statements in the articles.[6] Given the bereft factual allegations here, Galectin is not liable for any statements or omissions in the stock promoters' articles.

## D.    Representation of No Manipulation of Stock Price

The next question is whether Galectin's statement in the ATM offerings— that it has not taken action that caused or resulted in manipulation of its stock price—is an "untrue statement of a material fact," given that Galectin paid stock promoters to "tout" the stock and did not disclose those payments in the ATM offerings. For several reasons, we conclude that Galectin's "no manipulation" statement is not an "untrue statement of a material fact" in violation of § 10(b) of the Exchange Act or Rule 10b-5(b).

---

[6]We also see no allegation in the complaint that any statement in the articles was false. Rather, the complaint describes the articles as "exceedingly boastful." Even so, without ultimate authority or control over the final content, none of the defendants is the "maker" of the statements in the articles authored by the third-party promoters. Janus, 564 U.S. at 142, 131 S. Ct. at 2302.

We start with the premise that nothing in the securities laws prohibits Galectin as a company (issuing a regulated security) from hiring analysts to promote Galectin, circulating positive articles about its drug development, or recommending the purchase of Galectin's stock. Under § 17(b) of the Securities Act, the duty to disclose promotional payments lies with the parties that receive the payments for promotional activities. 15 U.S.C. § 77q(b). There is no statutory duty to disclose imposed on the issuer—here defendant Galectin—which paid for the promotional articles or activities. Garvey v. Arkoosh, 354 F. Supp. 2d 73, 83 (D. Mass. 2005).

"It may seem odd to the uninitiated, but nothing in the securities laws bars the issuer of a regulated security from paying an analyst for a stock recommendation." Id. "[T]he approach taken by the securities laws-in [sic] practical recognition of the fact that most market research is performed by analysts who are paid by brokerage firms, investment banks, and other marketers of securities—is to require disclosure of the fact that the analyst has been paid" by the analyst or the stock promoter in the article itself. Id. This way, the disclosure is visible to the reader in the article. Id. Galectin's engagement of third parties to promote awareness of its stock and to encourage investment in its business was legal and did not constitute stock-price manipulation. Because the securities laws otherwise place the duty to disclose payments only on the stock promoters here,

30

the defendants had no additional duty to disclose their payments to the stock promoters.

We recognize Hotz's contention that Galectin represented that it had not taken any action designed to cause "manipulation" of its stock price. What Hotz ignores, however, is the nuanced meaning of "manipulation" as that term is used in the securities laws. Manipulation "is virtually a term of art when used in connection with securities markets," generally referring "to practices, such as wash sales, matched orders or rigged prices, that are intended to mislead investors by artificially affecting market activity." Santa Fe Indus., Inc. v. Green, 430 U.S. 462, 476, 97 S. Ct. 1292, 1302 (1977) (quoting Ernst & Ernst v. Hochfelder, 425 U.S. 185, 199, 96 S. Ct. 1375, 1384 (1976)). "[Manipulation] connotes intentional or willful conduct designed to deceive or defraud investors by controlling or artificially affecting the price of securities." Ernst & Ernst, 425 U.S. at 199, 96 S. Ct. at 1384.

Here, there is no allegation that defendant Galectin or the other defendants engaged in any kind of simulated market activity or transactions designed to "create an unnatural and unwarranted appearance of market activity," which is required to constitute market manipulation. Santa Fe, 403 U.S. at 476-77, 97 S. Ct. at 1302 (quoting Piper v. Chris-Craft Indus., Inc., 430 U.S. 1, 43, 97 S. Ct. 926, 950 (1977)). The defendants' lawfully engaging third parties to "promote" the

31

Galectin stock through publications of boastful but truthful articles is not stock price "manipulation" as a matter of law. But cf. Levy v. United States, 626 F. App'x 319, 322 (2d Cir. 2015) (unpublished) (quotation omitted) (holding that the coordinated pre-promotion buying of stock was manipulation because potential investors "would check the activity and it would entice [them] to buy the stock," and the purchases would "artificially affect[] market activity in order to mislead investors"). As the district court correctly held, the defendants' lawful engagement of promotional firms to publicize Galectin and encourage investment in its shares was legal and did not constitute impermissible actions to manipulate the price of its shares.

Moreover, the complaint alleges only that Galectin did not disclose that it hired third parties to publish information that Hotz concedes was neither false nor misleading. As the district court correctly determined, that conduct is not "manipulation"; to the contrary, it is both contemplated and permitted under the securities laws. See 15 U.S.C. § 77q(b) (addressing the publication of stock recommendations in exchange for consideration and requiring disclosure of such compensation by the person who receives it, but not prohibiting such payments or requiring any disclosure by the issuer). Because the complaint fails to allege conduct by the defendants amounting to "manipulation" of Galectin's stock price, the complaint similarly fails to allege that Galectin's "no manipulation" statements

32

were untrue. As the "no manipulation" statement was not false or misleading (either standing alone, or in the absence of disclosure regarding engagement of the promotional firms), there was no Rule 10b-5(b) violation. The district court did not err in dismissing Hotz's misrepresentation claim.[7]

## E.    Fraud by Omission

"Silence, absent a duty to disclose, is not misleading under Rule 10b-5." Basic Inc. v. Levinson, 485 U.S. 224, 239 n.17, 108 S. Ct. 978, 987 n.17 (1988). Section 10(b) of the Exchange Act and Rule 10b-5(b) do not create an affirmative duty to disclose any and all material information. Nevertheless, Rule 10b-5(b) does

---

[7]Because there is no circuit precedent in this area, Hotz relies heavily on the decisions in In re CytRx Corp. Securities Litigation, No. CV 14-1956-GHK (PJWx), 2015 WL 5031232 (C.D. Cal. July 13, 2015) and in In re Galena Biopharma, Inc. Securities Litigation, 117 F. Supp. 3d 1145 (D. Or. 2015). Besides being non-precedential here, those decisions have materially different facts from this case. In both CytRx and Galena, the company's executive officers edited, approved, and controlled the content of the articles before payment and publication. CytRx, 2015 WL 5031232 at *2; Galena, 117 F. Supp. 3d at 1158, 1187 (concluding that the defendants had "ultimate authority" over the content). The articles were described as "misleading" and were written under different aliases without disclosing that the companies controlled the content and paid for the articles. CytRx, 2015 WL 5031232 at *9; Galena, 117 F. Supp. 3d at 1158. In Galena, some articles falsely disclaimed that they were not paid promotions. Galena, 117 F. Supp. 2d at 1158.  In CytRx, the district court concluded that the defendants' plan was "not simple marketing" by an independent third party, but rather a purposeful campaign in which the defendants reviewed, edited, approved, and controlled the "misleading" articles before publication. CytRx, 2015 WL 5031232 at *8.

In addition, in Galena, the officers "pumped and dumped" (sold their stock after the price rose). Galena, 117 F. Supp. 3d at 1160. In CytRx, the directors allegedly took advantage of the inflated stock prices and "award[ed] themselves . . . with massive amounts of perfectly-timed stock option grants." 2015 WL 5031232 at *2 (alteration in original). This case is, at most, a "pump" without a "dump." Cf. Stephens v. Uranium Energy Corp., Civil Action No. H-15-1862, 2016 WL 3855860, at *1-2 (S.D. Tex. July 15, 2016) (determining that the plaintiff failed to allege a "pump and dump" scheme against a uranium production company where the company paid third-party promoters for company advertisements but the company directors did not sell the company stock while the price was inflated).

33

"prohibit[] not only literally false statements, but also any omissions of material fact 'necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading.'" FindWhat Investor Grp. v. FindWhat.com, 658 F.3d 1282, 1305 (11th Cir. 2011) (quoting 17 C.F.R. § 240.10b-5(b)). See also Matrixx Initiatives, Inc. v. Siracusano, 563 U.S. 27, 44, 131 S. Ct. 1309, 1321 (2011) (quoting same).

Hotz claims that Galectin's 10-K and 10-Q reports of the results of its October 25, 2013 ATM offering were misleading because Galectin omitted that it had paid third parties to write articles promoting its stock. The reports showed the number of new shares issued in that ATM offering, the price per share, and the net proceeds raised. There is no allegation that those financial figures were inaccurate. Rather, Hotz alleges that by reporting those financial facts—even if they were true—a duty arose for Galectin to disclose that it had paid third parties for stock-promotion articles.[8]

"By voluntarily revealing one fact about its operations, a duty arises for the corporation to disclose such other facts, if any, as are necessary to ensure that what was revealed is not 'so incomplete as to mislead.'" FindWhat, 658 F.3d at 1305 (quoting Backman v. Polaroid Corp., 910 F.2d 10, 16 (1st Cir. 1990) (en banc)).

---

[8]Hotz's complaint does not allege that Galectin's 10-K and 10-Q reports otherwise made boastful or misleading statements about Galectin's market competitiveness. The portions of Galectin's reports cited in Hotz's complaint are limited to Galectin's disclosures of the financial figures from its October 23, 2013 ATM offering.

"[E]ven absent a duty to speak, a party who discloses material facts in connection with securities transactions assumes a duty to speak fully and truthfully on those subjects." Id. (alteration in original) (quoting In re K-tel Intern., Inc. Sec. Litig., 300 F.3d 881, 898 (8th Cir. 2002)). In sum, "a defendant may not deal in half-truths." Id. (quoting First Va. Bankshares v. Benson, 559 F.2d 1307, 1314 (5th Cir. 1977)).[9]

Given that Galectin's 10-K and 10-Q reports did no more than accurately report the number of shares sold, the price per share, and the net proceeds, we cannot say that Galectin, by reporting those figures, created a duty for itself to disclose that it had engaged and paid third parties to promote its stock. Notably too, for the same reasons that there was no duty on Galectin to disclose in the ATM offerings that it had paid third parties to write articles about Galectin, there was no duty on Galectin to disclose in the 10-K and 10-Q reports that it had paid the same third parties to write the same articles.[10]

---

[9]This Court adopted as binding precedent all Fifth Circuit decisions prior to October 1, 1981. Bonner v. City of Prichard, 661 F.2d 1206, 1209 (11th Cir. 1981) (en banc).

[10]As an alternative and independent ground, we conclude that Hotz's complaint also fails to state sufficient facts that, if true, establish the requisite scienter. Under the PSLRA, the plaintiff must state with particularity facts giving rise to a "strong inference" that the defendant acted with scienter. 15 U.S.C. § 78u-4(b)(2)(A). "[S]cienter consists of intent to defraud or 'severe recklessness' on the part of the defendant." Edward J. Goodman Life Income Trust v. Jabil Circuit, Inc. 594 F.3d 783, 790 (11th Cir. 2010) (quoting McDonald v. Alan Bush Brokerage Co., 863 F.3d 809, 814 (11th Cir. 1989)). Severe recklessness is "limited to those highly unreasonable omissions or misrepresentations that involve . . . an extreme departure from the standards of ordinary care" that are so likely to mislead that "the defendant must have been aware of it." Mizzaro v. Home Depot, Inc., 544 F.3d 1230, 1238 (11th Cir. 2008) (quoting Bryant, 187 F.3d at 1284). Under the PSLRA's heightened pleading standard, the factual

35

The omission of facts is actionable only to the extent that the absence of those facts would, under the circumstances, render another reported statement misleading to the "reasonable investor, in the exercise of due care." Id. at 1305 (quoting Sec. & Exch. Comm'n v. Texas Gulf Sulphur Co., 401 F.2d 833, 863 (2d Cir. 1968)). Commercial analysts are routinely paid to promote stocks. It cannot be said that the reasonable securities investor would conclude, based on Galectin's reporting of the number of shares sold, price per share, and net proceeds of its October 25, 2013 ATM offering, without more, that Galectin was in some way certifying or representing that it had not paid promoters to tout its stock to potential investors. It follows that Galectin's silence on this separate payment issue in its 10-K and 10-Q reports did not render the true facts in those reports misleading within the meaning of Rule 10b-5(b).

## F.    Count III—Claim Under § 20(a) of the Exchange Act

Section 20(a) of the Exchange Act imposes joint and several liability on "[e]very person who, directly or indirectly, controls any person liable" for violation of the securities laws. 15 U.S.C. § 78t(a). "Control person liability is secondary only and cannot exist in the absence of a primary violation." Southland Sec. Corp.

---

allegations in Hotz's complaint are insufficient to state a claim of scienter. See Stephens, 2016 WL 3855860 at *14 (concluding that, absent an affirmative duty to disclose the payments to third-party companies promoting the company's stock, the defendant company officers' general knowledge of the promotional campaign did not support an inference that they acted with scienter).

36

v. Inspire Ins. Sols., Inc., 365 F.3d 353, 383 (5th Cir. 2004). For control-person liability, a plaintiff must allege: "(1) a primary violation of federal securities laws," and; "(2) that the defendant exercised actual power or control over the primary violator." Howard v. Everex Sys., Inc., 228 F.3d 1057, 1065 (9th Cir. 2000).[11] Because Hotz's complaint does not allege a primary violation, Hotz's § 20(a) claim fails.

### III.  CONCLUSION

For all of these reasons, we affirm the district court's dismissal of Hotz's complaint.

**AFFIRMED.**

---

[11]"Control" is defined by the SEC as "the possession, direct or indirect, of the power to direct or cause the direction of the management and policies of a person, whether through the ownership of voting securities, by contract, or otherwise." 17 C.F.R. § 230.405; see also Howard, 228 F.3d at 1065 n.9 (accepting the SEC's definition of control). Whether an individual defendant is a "controlling person 'is an intensely factual question,' involving scrutiny of the defendant's participation in the day-to-day affairs of the corporation and the defendant's power to control corporate actions." Kaplan v. Rose, 49 F.3d 1363, 1382 (9th Cir. 1994) (quoting Arthur Children's Trust v. Keim, 994 F.2d 1390, 1396-97 (9th Cir. 1993)).

37