SUPREME JUDICIAL COURT 
 
 GIUL, LLC v. SHENGHUO MEDICAL, LLC, D/B/A K2 MEDICAL; MICHAEL J. ANTONOPLOS, RICHARD P. BLUMBERG, MARK L. FAUPEL, AND MARK S. PEARLSTEIN

 
 Docket:
 1984CV02862-BLS2
 
 
 Dates:
 August 16, 2024
 
 
 Present:
 Kenneth W. Salinger
 
 
 County:
 SUFFOLK
 

 
 Keywords:
 FINDINGS AND CONCLUSIONS AFTER A BENCH TRIAL
 
 

 GIUL, LLC, contends that it was duped into making a bad investment in Shenghuo Medical, LLC, with the understanding that Shenghuo would use the money invested by GIUL to help fund Shenghuo’s own investment in Guided Therapeutics, Inc. (“GTI”). Some of GIUL’s claims were dismissed. Others were resolved in favor of defendants Shenghuo, Michael Antonoplos, Richard Blumberg, Mark Faupel, and Mark Pearlstein on summary judgment.
The Court recently tried GIUL’s remaining claims without a jury. Based on the findings below, the Court concludes that GIUL has failed to prove that it is entitled to any relief under the Massachusetts Uniform Securities Act (G.L. c. 110, § 410(a), known as “MUSA”) or under the Massachusetts Consumer Protection Act (G.L. c. 93A, § 11). GIUL did not prove its MUSA claim because it failed to show that any of the defendants offered or sold any security by making a false statement or by withholding material information. The MUSA claim against Faupel and Pearlstein also fails for the additional reasons that neither of them offered, sold, or transferred any security to GIUL; had control of Shenghuo; or materially aided the sale of securities to GIUL as an agent of Shenghuo. Finally, GIUL did not prove its c. 93A claim because it failed to prove that any of the defendants engaged in unfair or deceptive conduct in connection with GIUL’s investment in Shenghuo, either before GIUL made that investment or later on. Final judgment will therefore enter providing that GIUL shall take nothing on its claims.
1. Procedural Background. The following background explains the scope of the issues that the Court must now decide, and why the Court is deciding them without a jury.
 
                                                            -1-
1.1. Pre-trial Disposition of Certain Claims. Shenghuo’s original complaint asserted claims against Shenghuo, Antonoplos, Blumberg, Faupel, and Pearlstein. It also asserted reach-and-apply claims against Shenghuo and GTI.
The Court granted partial judgment on the pleadings, in August 2020, in favor of Mr. Pearlstein as to the claims against him for breach of fiduciary duty and to establish a constructive trust against his assets or property.
At the same time, the Court also denied GIUL’s motion to amend its complaint to assert substantive claims against GTI under MUSA and c. 93A. It concluded that these claims would be futile because GIUL’s proposed allegations did not plausibly suggest that GTI had control over Shenghuo or that any of the current defendants had actual or apparent authority to act as agents for GTI.
Fifteen months later, GIUL sought leave to file a different amended complaint. In March 2022, the Court permitted GIUL to add certain claims against existing defendants. But it denied the motion to the extent that GIUL sought to assert a claim for “fraud on the court” against the five current defendants, because there is no such thing as a cause of action for fraud on the court. The amended complaint that GIUL filed in accord with the Court’s March 2022 ruling is now the operative pleading.
The Court also denied GIUL’s request to add new claims against GTI for fraud, violation of G.L. c. 93A, and conspiracy to commit fraud. The Court concluded that the factual allegations in the proposed amended complaint did not plausibly suggest that GTI ever said or did anything to give Mark Faupel authority to serve as GTI’s agent in raising money from GIUL or others. GIUL twice sought interlocutory review of the Court’s second denial of leave to add claims against GTI. An Appeals Court single justice denied both petitions.
Judge Ricciuti granted summary judgment in favor of the Defendants in February 2023 on GIUL’s claims for fraud, breach of fiduciary duty, and breach of contract, as well as the two reach and apply claims. One year later, this Court (Salinger, J.) granted summary judgment in favor of the Defendants on GIUL’s claim for conspiracy, because there can be no civil conspiracy without an underlying common law tort and Judge Ricciuti had granted summary judgment in favor of the defendants on all of GIUL’s remaining tort claims.[1]
 
--------------------------------------------
 
[1]                    See Greene v. Philip Morris USA Inc., 491 Mass. 866, 871 (2023) (claim for concerted action civil conspiracy “is ‘akin to a theory of common law joint
<continued…>
 
                                                            -2-
 
1.2. Bench Trial of the MUSA and c. 93A Claims. This left only GIUL’s claims under MUSA and G.L. c. 93A to be tried. The Court ruled that GIUL had no right to a jury trial on either claim, and exercised its discretion to try these claims without a jury.
GIUL had no right to have a jury decide its MUSA claim because GIUL sought to rescind its investment in Shenghuo as the remedy for the alleged MUSA violation, this statutory remedy is analogous to cases within the Superior Court’s equity jurisdiction as to which there is no constitutional right to a trial, and MUSA does not create any statutory right to a jury trial. See Bertolino v. Fracassa, Suffolk Super. Ct. no. 1784CV00210-BLS2, 2020 WL 8183088, at *1 (Oct. 27. 2020) (Sanders, J.); see generally Rosati v. Boston Pipe Covering, Inc., 434 Mass. 349, 350 (2001) (if plaintiff’s claim “ ’is analogous, in either subject matter or remedy sought, to cases within the court’s equity jurisdiction, as it existed at the time of the adoption of the Constitution,’ there is no right to trial by jury”) (quoting Dalis v. Buyer Advertising, Inc., 418 Mass. 220, 223 (1994)); see also Demoulas v. Demoulas Super Markets, Inc., 424 Mass. 501, 526–527 (1997) (no right to jury trial on shareholder derivative claim for rescission); Ginn v. Almy, 212 Mass. 486, 494–495 (1912) (no right to jury trial on claim for rescission of transfer of money or stock); Keville v. McKeever, 42 Mass. App. Ct. 140, 147 (1997) (no right to jury trial on claim for rescission of transfers of real and personal property).
There is similarly no constitutional or statutory right to a trial by jury on a claim under G.L. c. 93A. See Nei v. Burley, 388 Mass. 307, 315 (1983).
2. Findings of Fact. The Court heard testimony from five witnesses, and admitted 47 exhibits into evidence, during a four-day bench trial. The witnesses were Paul Conte, who owns and controls GIUL, and the four individual defendants. The Court makes the following findings of fact based on the testimony and exhibits presented at trial, and on reasonable inferences that the Court has drawn from that evidence. The Court does not credit any trial testimony, by Mr. Conte or the individual defendants, that is inconsistent with its findings below.
 
--------------------------------------------
 
liability in tort’ ”) quoting Aetna Cas. Sur. Co. v. P & B Autobody, 43 F.3d 1546, 1564 (1st Cir. 1994); Bartle v. Berry, 80 Mass. App. Ct. 372, 383–384 (2011) (to prove a claim for concerted action civil conspiracy, plaintiff “must show an underlying tortious act in which two or more persons acted in concert and in furtherance of a common design or agreement”).
 
                                                            -3-
 
2.1. Events Preceding any Solicitation of Conte or GIUL. As discussed in sections 2.2.1 through 2.2.4 below, Shenghuo solicited Conte to invest in the company, and he agreed to do so through GIUL, LLC, in June and July of 2016. The formation of Shenghuo, its licensing agreement with GTI, and the subscription agreements entered into by the first two investors in Shenghuo provide the context for GIUL’s subsequent investment.
2.1.1. The Formation of Shenghuo. Dr. Mark Faupel is a co-inventor of a cervical cancer screening and diagnostic device that is manufactured and marketed by Guided Therapeutics, Inc. (“GTI”). This device, called the LuViva® Advanced Cervical Scan device, uses spectroscopy to project light onto a woman’s cervix, causing cells associated with cancer to fluoresce or to give other recognizable signals. Dr. Faupel served as GTI’s chief executive officer from 2008 to 2013. He was succeeded by Dr. Gene Cartwright. Faupel worked as a consultant for GTI through mid-2015. He rejoined GTI’s board of directors in December 2016. After Cartwright retired in 2023, Faupel once again became CEO of GTI.
Richard Blumberg met Faupel around 2006 or 2007. He became a shareholder of GTI a few years later.
Blumberg became interested in forming a company that could commercialize the LuViva device in China and elsewhere in Asia. He ran this idea past Mark Antonoplos, who was the CEO for a breast cancer diagnostic company. Antonoplos expressed interest in participating in this new venture.
Blumberg and Antonoplos formed this company, which they called Shenghuo Medical LLC, in February 2015. Antonoplos arranged for Mark Pearlstein, a lawyer, to draft and file the paperwork needed to create Shenghuo.
Blumberg and Antonoplos were Shenghuo’s initial Managing Members. Soon after Shenghuo was formed, Faupel and Pearlstein also became members of this limited liability company, but did not serve as Managing Members until well after GIUL made its investment in the company. Pearlstein served as Shenghuo’s legal counsel.
At some point, after a potential commercial partner in China objected to the name  Shenghuo,  the  company  began  doing  business  using  the  name    K2 Medical. Shenghuo started using the K2 name before June 2016. As a result, some of the documents admitted into evidence refer to Shenghuo as K2. The
 
                                                            -4-
 
Court will refer to the entity as Shenghuo, as the parties generally did throughout the trial of this case.
2.1.2. Shenghuo’s Licensing Agreement with GTI. Not long after Shenghuo was formed, GTI granted it exclusive distribution rights for LuViva in China, Hong Kong, and Macau.
About a year later, Blumberg negotiated a broader licensing agreement under which GTI gave Shenghuo the exclusive right to to sell, distribute and also manufacture LuViva in China, Hong Kong, and Macau, as well as in the Philippines and in eight other countries in Southeast Asia and Indonesia. The agreement provided that Shenghuo would not have a right to use this License until Shenghuo invested, or arranged for a consortium of others to invest, $200,000 in GTI. Shenghuo and GTI executed this contract on June 5, 2016.
The required investment in GTI was to be structured as a conditional loan that would be repaid with interest, but only after GTI succeeded in obtaining at least $1 million in additional financing from another source or sources. If GTI obtained such additional funding within 90 days after the licensing agreement was executed, then GTI would be obligated to pay $240,000 to Shenghuo or its consortium of investors, which would provide a 20 percent return on this very short-term loan. If GTI obtained additional financing of $1 million or more at a later time, then GTI would be obligated to pay Shenghuo or the consortium $300,000, or 1.5 times the amount that Shenghuo or the consortium was loaning to GTI. And if GTI made this payment after December 31, 2016, it would also have to pay additional interest of 20 percent per year compounded annually. GTI had no obligation under the licensing agreement to repay anything to Shenghuo or the consortium if GTI failed to obtain at least $1 million in additional financing.
This licensing agreement also provided that the investment by Shenghuo, or a consortium arranged by Shenghuo, would be treated as a convertible note giving Shenghuo or the consortium the right to convert the loan into GTI common stock.[2]
 
--------------------------------------------
 
[2] The Court finds that, although the licensing agreement says that the note will  be convertible “at the Consortium’s option,” the plain meaning of the contract, when read as a whole, was to give either Shenghuo or a consortium of investors the  right  to  convert  the  note  to  common  stock.  That  was  Shenghuo’s
<continued…>
 
                                                            -5-
 
2.1.3. Initial Investors in Shenghuo. After Shenghuo entered into its licensing agreement with GTI, it promptly set about raising the $200,000 that needed to provide to GTI to satisfy the financing condition.
Shenghuo had pulled together $136,000 in funding before arranging for GIUL to invest the remaining $64,000. John Imhoff and Stephen Maloof were investors in GTI and very interested in helping GTI survive and grow. Mark Faupel ultimately convinced them both to invest $60,000 in Shenghuo; Imhoff made the investment personally and Maloof had his spouse make the investment. In addition, Faupel invested $10,000 in Shenghuo. And Shenghuo itself was able to contribute $6,000 of the money that it needed to satisfy its obligation to make the conditional loan to GTI.
Faupel was the person who approached Imhoff and Maloof about making equity investments in Shenghuo, because he knew them through their shared involvement in GTI. After Imhoff and Maloof both expressed interest in investing in Shenghuo, Faupel negotiated the terms of those investments on behalf of Shenghuo; he did so in consultation with and as authorized by Blumberg. It was Blumberg, in his capacity as one of the Managing Members of Shenghuo, who decided what terms Shenghuo would accept in exchange for investments by Imhoff and Maloof.
At first, Imhoff and Maloof each agreed to pay $50,000 to purchase specified ownership interests in Shenghuo. Pearlstein, acting at Blumberg’s direction, prepared and sent Imhoff and Maloof draft Membership Interest Subscription Agreements reflecting the initial terms that Imhoff and Maloof said they would accept; these drafts provided that Imhoff and Maloof would each invest $50,000 in Shenghuo in exchange for receiving a specified number of membership units at a specified price per unit.
Blumberg and Faupel knew that GTI was working with an investment banker (the firm Ladenberg Thalmann) that was preparing an S-1 registration statement to raise $5 million in equity for the company from outside investors. They believed at the time that there was a good likelihood that GTI would be
 
--------------------------------------------
 
understanding at the time, as reflected in a letter from Blumberg to Shenghuo investors dated 7 June 2016, in which Blumberg said that Shenghuo will be investing $200,000 in GTI, and in exchange “will receive a convertible note and warrants from GTI.” That was GTI’s understanding as well; after Shenghuo completed its $200,000 investment, GTI stated in a Form 10-K filed with the SEC in March 2017 that it had agreed to issue a convertible note to Shenghuo.
 
                                                            -6-
 
successful, and therefore would soon repay Shenghuo. That belief was reasonable because Imhoff and Maloof, who held ownership stakes in GTI and were very familiar with its business plans and prospects, had told Faupel that GTI would soon be soliciting new investments and that both Imhoff and Maloof expected GTI to succeed in doing so fairly soon.
Based on that understanding, Blumberg and Faupel decided that they would sweeten the offer to Imhoff and Maloof, in an attempt to convince them to increase their investments to $60,000 each. Shenghuo proposed that, if Imhoff and Maloof agreed to invest at this higher level, Shenghuo would give them an additional, conditional repayment right providing that, if GTI repaid the conditional loan it obtained from Shenghuo, then Shenghuo would use part of those proceeds to repay Imhoff’s and Maloof’s investments—but Imhoff and Maloof would nonetheless retain their equity interest in Shenghuo.
Imhoff and Maloof agreed to these revised terms. The revised subscription agreements that Imhoff and Maloof’s spouse entered into with Shenghuo included this conditional repayment provision, in addition to granting them membership interests in Shenghuo, in exchange for each of them investing $60,000 in the company. The conditional repayment provision was set out in two “whereas” clauses in the revised subscription agreements, which said that each investor would be repaid in full “but solely through monies received for that purpose from GTI” and also that each of them would retain their membership units in Shenghuo whether their investment was repaid “solely through monies received for that purpose from GTI” or was not repaid. The conditional repayment provision was also reflected in side-letters sent by Blumberg, which promised Imhoff and Maloof’s spouse that if GTI was successful in raising at least $1 million in its planned public offering, and as a result Shenghuo received a repayment from GTI, then Shenghuo would distribute all funds received to its investors within five days “in the pro rata amount of their investment.”
Imhoff and Maloof’s spouse each signed the revised subscription agreements and made a $60,000 in Shenghuo in early June 2016.
2.2. GIUL’s Investment in Shenghuo. Antonoplos had met Paul Conte about 10 years earlier. They stayed in close contact, often speaking by telephone several times each week. Conte has a law degree and decades of professional experience with financial transactions and investments.
 
                                                            -7-
 
2.2.1. Antonoplos Approaches Conte. As Faupel and Blumberg were working to finalize the Imhoff and Maloof investments, Antonoplos thought that Conte might have clients who could be interested in providing the remaining funds that Shenghuo needed to raise.
So Antonoplos, acting on behalf of Shenghuo and as one of its Managing Members, called Conte in early June 2016 and explained in general terms the opportunity that Shenghuo had to market GTI’s LuViva product in China and elsewhere in Asia. He also explained that Shenghuo had to come up with $200,000 in order to be able to distribute the LuViva product, and t had to come up with a partner in China that would be acceptable to GTI. Antonoplos let Conte know that Shenghuo had secured $136,000 of the amount that it needed to raise and was looking for someone to invest the remaining $64,000, so that Shenghuo could then invest $200,000 in GTI.
Antonoplos made clear to Conte during this conversation that Shenghuo had no present income, and that the reason to invest in Shenghuo was to become a part-owner of a company with great future revenue potential from selling GTI’s product. Antonoplos also made clear, and Conte understood, that Shenghuo’s only real asset was its license agreement with GTI.
Antonoplos explained in general terms that anyone willing to invest the remaining $64,000 would receive an ownership interest in Shenghuo as well as a conditional right to repayment of the investment amount.
The Court credits Antonoplos’ testimony on cross-examination that he told Conte that repayment of the final $64,000 investment was contingent on GTI raising an additional $1 million and then repaying Shenghuo. This was consistent with the licensing agreement between Shenghuo and GTI, and with the terms of the subscription agreements that were offered to and accepted by Shenghuo’s first two investors (Imhoff and Maloof’s spouse). The Court finds that Conte was aware of and understood this part of Shenghuo’s offer. The Court also credits Antonoplos’ testimony that he never told Conte that repayment would be guaranteed or that there would be any deadline by which Shenghuo would be required to repay this investment.
During this telephone conversation, Conte asked Antonoplos to send him an email summarizing the opportunity to invest in Shenghuo.
As requested, Antonoplos followed up with an email to Conte on June 9, 2016. At the start of the email, Antonoplos told Conte to “check the website for
 
                                                            -8-
 
Guided Therapeutics, Inc.” for more information about GTI; he also included a link to that website (www.guidedinc.com) in the subject line of the email. GTI is and in 2016 was a publicly traded company. It has, and in 2016 had, a public website that (among other things) provided information to potential investors in GTI, including through links to all of GTI’s prior regulatory filings with the Securities and Exchange Commission (“SEC”); those filings contained a wealth of information about GTI’s finances and business prospects, and also contained the Licensing Agreement that GTI had entered into with Shenghuo.
Antonoplos went on in this June 9 email to summarize Shenghuo’s right under its licensing agreement to manufacture, sell, and distribute GTI’s portable cervical cancer detection device, and to list the countries where Shenghuo could do so. He reiterated that Shenghuo had to come up with $200,000 that it would loan to GTI, that Shenghuo had raised $136,000 of that amount so far, and that it needed to raise the remaining $64,000 by the end of July. Antonoplos also reiterated that the investor who provided the $64,000 would be given certain repayment rights “plus receive an interest in Shenghuo.”
The GTI website that Antonoplos told Conte to review fully disclosed GTI’s financial condition, including that GTI was not and had not yet been profitable, had almost no cash on hand, and had substantial debt and other current liabilities. Conte was a sophisticated investor who had the ability to review and understand the financial information that GTI made available in the then- current and historic SEC filings that Conte was able to access through the GTI website link that Antonoplos had sent to Conte.
If Conte had clicked on the link to GTI’s website that Antonoplos provided, he could easily have accessed GTI’s regulatory filings with the SEC, including its most recent 10-K annual report and most recent 10-Q quarterly report. Conte never asked Antonoplos or anyone else connected with Shenghuo for any additional information about GTI’s financial condition before deciding whether to invest in Shenghuo.
The Court takes judicial notice that at the time Conte was deciding whether to invest in Shenghuo, GTI’s most recent 10-K and 10-Q filings, which were available at GTI’s website, included the following disclosures:[3]
 
--------------------------------------------
 
[3]                    The Court may take judicial notice of facts “capable of accurate and ready determination by resort to resources whose accuracy cannot reasonably be
<continued…>
 
                                                            -9-
 
o GTI’s 10-K report for the year ending December 31, 2015, disclosed at pages 8–9 that: (I) “Although we will be required to raise additional funds during the second quarter of 2016, there is no assurance that such funds can be raised on terms that we would find acceptable, on a timely basis, or at all;” and (ii) “If we cannot obtain additional funds or achieve profitability, we may not be able to continue as a going concern.”[4]
 
--------------------------------------------
 
questioned.” Commonwealth v. Greco, 76 Mass. App. Ct. 296, 301 n.9, rev. denied,
457  Mass.  1106  and  458  Mass.  1105  (2010),  quoting  Mass.  Guide  Evid.
§ 201(b)(2). This includes the content of SEC filings that are publicly accessible. See, e.g., Cyntec Co., Ltd. v. Chilisn Elec. Corp., 84 F.4th 979, 989 n.6 (Fed. Cir. 2023) (taking judicial notice of disclosures in Apple’s 2020 Form 10-K, in reviewing trial court’s denial of motion to exclude expert opinion as to damages); DFC Global Corp. v. Muirfield Value  Partners, L.P., 172 A.3d 346,  351 n.7 (Del. 2017) (taking notice of facts disclosed in plaintiff’s Form 10-K, in reviewing trial court’s findings in appraisal action); see also Fire & Police Pension Ass'n of Colorado v. Abiomed, Inc., 778 F.3d 228, 232 n.2 (1st Cir. 2015) (trial court properly considered contents of defendant’s filings with SEC in deciding motion to dismiss, even though they were not referenced in or attached to the complaint); Rothman v. Gregor, 220 F.3d 81, 88 (2d Cir. 2000) (same); Schmidt v. Skolas, 770 F.3d 241, 249 (3d Cir. 2014) (same); Yates v. Municipal Mortg. & Equity, LLC, 744 F.3d 874, 881 (4th Cir. 2014) (same); Basic Capital Mgmt, Inc. v. Dynex Capital, Inc., 976 F.3d 585, 589 (5th Cir. 2020) (same); Northstar Financial Advisors Inc. v. Schwab Investments, 779 F.3d 1036, 1043 (9th Cir. 2015) (same); Bryant v. Avado Brands, Inc., 187 F.3d 1271, 1276–1277 (11th Cir. 1999) (same); see also G.L. c. 233, § 76A (authenticated copies of SEC filings are admissible in evidence).
The statements by GTI in these 10-K and 10-Q filings are not hearsay because the Court is considering them not for the truth of those statements, but only to understand the nature of the financial and business disclosures by GTI to which Antonoplos had directed Conte. “If a statement is offered for any purpose other than for its truth, it is not hearsay.” Commonwealth v. Keown, 478 Mass. 232, 245 (2017). For example, “[a]n extrajudicial statement is not hearsay when offered to prove that the person to whom it was addressed had notice or knowledge of the contents of the statement.” Pardo v. General Hosp. Corp., 446 Mass. 1, 19 (2006), quoting P.J. Liacos, M.S. Brodin, & M. Avery, Massachusetts Evidence § 8.2.2., at 466 (7th ed. 1999).
[4]        This 10-K report is publicly available from the SEC at https://www.sec.gov/Archives/edgar/data/924515/000112178116000420/gthp_ 10k123115.htm.
                                                            -10-
 
o GTI’s 10-Q report for the quarter ending March 31, 2016, disclosed at page 20 that GTI had only $56,000 in cash on hand, had a “working capital deficit of approximately $4.0 million,” and “will be required to raise additional funds through public or private financing, additional collaborative relationships or other arrangements, as soon as possible.” This page also disclosed that GTI “cannot be certain that our existing and available capital resources will be available to satisfy our funding requirements through the second quarter of 2016,” that “[s]ubstantial capital will be required to develop our products,” and that these factors “raise substantial doubt about our ability to continue as a going concern.”[5]
If the Court did not take judicial notice of the specific contents of these 10-K and 10-Q filings, that would not cause it to alter any of its other findings of fact or reach any different conclusions in this case. The contents of these filings merely confirm Blumberg’s testimony at trial, which the Court fully credits, that the information available at GTI’s website when Antonoplos directed Conte to it fully disclosed GTI’s financial condition. The Court would credit that testimony, and would still make its other findings and reach its other conclusions, even if it had not considered the actual contents of GTI’s disclosures in the SEC filings quoted above.[6]
2.2.2. Conte Expresses Interest. Two days later, on June 11, 2016, Conte responded to Antonoplos by email, asking “Does the lender get the 64k in stock too in making the loan?” Conte said that, if so, he may be “interested personally” in making this investment. Antonoplos immediately responded in a one-word email that said simply, “Yes.”
Later that day, Antonoplos sent a clarifying email. In it, he told Conte that the “$64k lender” would: (I) get $76,800, or have the right to convert that amount into roughly 4.41 million shares, if repaid within 90 days; (ii) get $83,200, or
 
--------------------------------------------
 
[5]        This 10-Q report is publicly available from the SEC at https://www.sec.gov/Archives/edgar/data/924515/000112178116000472/gthp1 0q33116.htm.
[6] Nonetheless, if GIUL believes that the Court should not have taken judicial notice of these disclosures in the GTI filings that were made available to Conte before he decided to invest in Shenghuo, or if it wishes to be heard on this issue for some other reason, it may seek reconsideration on that basis. Cf. Mass. G. Evid. § 201(d) (“If the court takes judicial notice before notifying a party, the party, on request, is still entitled to be heard.”).
 
                                                            -11-
 
have the right to convert that amount into roughly 4.78 million shares, if repaid later; and (iii) “in addition, lender will receive 10% interest in Shenghuo at $600k pre-valuation.” In other words, Antonoplos informed Conte that this investor would be a lender with certain repayment rights, and also obtain a  10 percent ownership interest in Shenghuo. Antonoplos did not tell Conte, either in this email or at any other time, that this investor would have any right to be repaid by Shenghuo by any particular date.
2.2.3. The Meeting of the Minds. A few weeks later, on June 29, 2016, Antonoplos sent to Conte a copy of the revised subscription agreement that Imhoff had signed, with Imhoff’s name removed. Conte understood that Shenghuo was offering to let him invest on the same terms, albeit at the $64,000 level rather than the $60,000 referenced in the specimen subscription agreement that Antonoplos provided. Conte read and understood the terms contained in this specimen agreement.
The specimen subscription agreement that Antonoplos forwarded to Conte said, in the sixth and seventh whereas clauses, that Shenghuo would repay the investor “solely through monies received for that purpose from GTI.” Antonoplos had told Conte, and Conte understood, that this meant that if he invested $64,000 in Shenghuo that investment would be repaid with interest if and only if GTI raised $1 million in additional financing and therefore repaid what it owed to Shenghuo. The Court does not Conte’s testimony that Antonoplos failed to disclose this to him or that Conte did not understand this before he agreed to invest in Shenghuo.
When Antonoplos was soliciting an investment by Conte on behalf of Shenghuo, Antonoplos and Blumberg both (1) reasonably expected that GTI would soon be able to raise at least $1 million in additional funding, and would therefore repay Shenghuo’s loan to GTI with substantial interest before the end of 2016, and (2) intended that Shenghuo would then repay Conte’s investment with interest in accord with the conditional repayment right that it had offered to Imhoff and Maloof’s spouse and was now offering to Conte.
And Antonoplos disclosed the basis for that expectation to  Conte.  In  the June 29, 2016, email, Antonoplos explained that the specimen subscription agreement attached to the email was the agreement that Shenghuo used for its prior two investors. He added that the other two investors in Shenghuo were also “heavy investors” in GTI, one of them was a GTI board member, and “they are both convinced that they will get their money back [from Shenghuo] in
 
                                                            -12-
 
90 days,” meaning that Imhoff and Maloof had both made clear that they expected GTI to succeed in raising at least $1 million in new funding and then repay Shenghuo without about three months.
Conte sought corroboration that he would be granted the same conditional loan terms by Shenghuo, and sought better to understand GTI’s conditional obligation to repay Shenghuo. So Antonoplos arranged for a brief three-way conversation among Conte and Shenghuo’s two Managing Members, Antonoplos and Blumberg. During this call, Blumberg reiterated that GTI was obligated to repay Shenghuo if GTI raised at least $1 million from another source, and explained that GTI had a strong incentive to do so as quickly as it could because the Licensing Agreement that GTI had entered into with Shenghuo would require GTI to pay 150 percent of Shenghuo’s $200,000 loan if GTI failed to repay Shenghuo within 90 days, plus 20 percent annual interest if it failed to repay Shenghuo by the end of 2016.[7]
Conte then agreed to invest $64,000 in Shenghuo on the terms contained in the specimen agreement that Antonoplos had sent to him, including the contingent repayment provisions. Conte understood at the time that there had been what he described as a “meeting of the minds” based on the terms that Shenghuo offered in the specimen agreement and that Conte then accepted. Conte accepted this offer orally by telling Antonoplos that he wanted to make this investment in Shenghuo, and reiterated the acceptance by paying $64,000 to Shenghuo on behalf of GIUL.
Although Antonoplos, in his July 11 email to Conte, had floated the idea of giving Conte to option to convert his conditional repayment right into an additional ownership interest in Shenghuo, no such provision was included in the specimen agreement. The Court finds that Conte reviewed and understood the terms contained in the specimen agreement, and that Conte understood
 
--------------------------------------------
 
[7] The Court does not credit Conte’s memory that this conversation took place among Conte, Antonoplos, and Faupel. In a February 2018 email, discussed in more detail below, Conte said he was promised “by the Managers of K2” (aka Shenghuo) that Conte would be repaid “when and if GT receives funding.” Conte knew that Antonoplos and Blumberg were the Managing Members of Shenghuo in 2016, and that Faupel was not a Manager of the Company. This email therefore confirms that Conte had this conversation with Antonoplos and Blumberg, rather than with Antonoplos and Faupel.
 
                                                            -13-
 
and agreed that Shenghuo was not going to grant him any option to convert his conditional repayment right into Shenghuo stock or membership units.
Once Conte said that he wanted to make this investment, Antonoplos and Blumberg instructed Pearlstein to prepare a subscription agreement for Conte with the same terms as the final, revised agreement signed by Imhoff and Maloof’s spouse, but for an investment of $64,000 rather than $60,000. Pearlstein prepared a subscription agreement for Conte that he thought was in this form; Pearlstein emailed it to Antonoplos on July 18, 2016, and Antonoplos promptly forwarded it by email to Conte (copying Pearlstein, Faupel, and Blumberg). This draft agreement said that it was being entered into by Conte “or an entity later designated by him.”
Conte signed this subscription agreement, and returned his signature pages to Shenghuo, on July 18, 2016. Conte signed the agreement and exhibit A to the agreement above the line labelled “Paul Conte, Investor,” which he revised to add “or assignee.”
In signing this written agreement, Conte agreed (as provided in the contract) that he had obtained “sufficient information to evaluate the merits and risks of an investment” in Shenghuo, and that Conte had “sufficient knowledge and experience in financial and business matters to evaluate the merits and risks associated with such investment and to make an informed investment decision with respect thereto.”
The next day, Conte decided he would rather make the investment through GIUL, LLC. So Conte sent an email asking that the agreement be revised to show that his investment in Shenghuo was being made by “Giul LLC.” Antonoplos or Blumberg instructed Pearlstein to make that change. So Pearlstein did so, and emailed a subscription agreement in GIUL’s name to Conte on July 19, copying Antonoplos, Faupel, and Blumberg); Pearlstein asked that Conte, Faupel, and Blumberg sign and return the signature pages to him.
Conte then caused GIUL to pay $64,000 to Shenghuo; GIUL is bound by the allegation in its complaint (at ¶ 26) that “GIUL, on July 19, 2016, provided its $64,000 in loan and investment funds to Shenghuo.”[8]  Two days later, Conte
 
--------------------------------------------
 
[8] See G.L. c. 231, § 87 (“In any civil action pleadings … shall bind the party marking them.”); Adiletto v. Brockton Cut Sole Corp., 322 Mass. 110, 112 (1947) (this statute provides that “facts admitted in pleadings” are “conclusive upon” the party making them).
 
                                                            -14-
 
sent an email saying that he would execute the revised subscription agreement and return a pdf copy. There is no evidence that he ever did so.
Shenghuo accepted GIUL’s $64,000 investment with the shared understanding that GIUL was receiving not only the ownership interest specified in the version that Conte had signed but also the conditional repayment rights contained in the prior specimen subscription agreement (identical to the agreement signed by Imhoff) that Conte had reviewed and the terms of which he had accepted. Conte manifested GIUL’s acceptance of these terms—which Antonplos had offered when he sent Conte the specimen subscription agreement—by first signing the subscription agreement on behalf of himself or his assignee, then asking that the agreement be revised to show that the investment was actually being made by GIUL, LLC, and then causing GIUL to pay the $64,000 investment amount to Shenghuo. Conte performed GIUL’s obligations under its subscription agreement by paying $64,000 to Shenghuo, and accepted GIUL’s benefits under that contract by accepting GIUL’s membership interest in Shenghuo and its agreed-upon conditional repayment rights; that performance and acceptance of benefits constituted and demonstrated acceptance of the terms of this contract.[9]
Conte confirmed later on that he had always understood the contingent nature of the repayment provisions in GIUL’s subscription agreement before deciding and agreeing to invest in Shenghuo. In February 2018, Conte sent emails to Faupel, Antonoplos, and Pearlstein seeking reassurance that he would be repaid when GTI raised its first $1 million in financing. Conte said in these emails that is what he had been promised when he agreed to invest $64,000 in Shenghuo. (In these emails, Conte refers to his investment in K2, rather than Shenghuo, because by then Shenghuo was doing business as K2.) In the first of these emails, Conte says he had been promised that he “would be paid back upon funding of GT,” and based on that promise said he expected to be repaid $90,000 “when and if GT receives funding.” In the second of these emails, Conte clarifies that he agreed to invest in Shenghuo only after being promised that his initial investment would be repaid with interest “upon [GTI] raising the first
 
--------------------------------------------
 
[9] See Polaroid Corp. v. Rollins Envt’l Servs. (NJ), Inc., 416 Mass. 684, 691 (1993). A party that acts as though it has accepted an offer and entered into a contract is bound by that contract. Martino v. First Nat. Bank of Boston, 361 Mass. 325, 332 (1972). “There is no surer way to find out what parties meant, than to see what they have done.” Id., supra, quoting Insurance Co. v. Dutcher, 95 U.S. 269, 273 (1877).
 
                                                            -15-
 
$1 Million in financing,” and that this promise “is what induced” him to make GIUL’s $64,000 investment. The Court credits these statements by Conte in his February 2018 emails. It does not credit Conte’s attempts when he testified at trial to disavow what he admitted in this emails.
The Court also does not credit Conte’s testimony during the 2024 trial that Antonoplos had made an unconditional promise that Shenghuo would repay Conte’s $64,000 investment within 90 days, or that Antonoplos ever said or indicated that Conte would have an absolute right to be repaid at any other time. Instead, based on Conte’s admissions in his February 2018 emails, the Court finds that Conte was always well aware that GIUL’s subscription agreement with Shenghuo does not set any deadline for repayment, and that the subscription agreement instead provided that Shenghuo would repay Conte if and only if GTI repaid Shenghuo, and that GTI had no obligation to do so until it raised $1 million from other investors.
2.2.4. The Scrivener’s Error and the Parties’ Mutual Intent. When Pearlstein sent the first subscription agreement to Conte for his signature, Pearlstein thought he had taken the final, revised subscription agreement that was prepared for and signed by Imhoff or Maloof’s spouse, changed the name of the investor to Paul Conte, changed the amount of the investment from $60,000 to $64,000, and made a corresponding change to the number of membership units in Shenghuo that Conte would acquire. In other words, Pearlstein intended to prove a draft consistent with the specimen agreement that Conte had reviewed and accepted, including the conditional repayment provision included in two of the “whereas” clauses.
But Pearlstein mistakenly started with an original draft of the subscription agreement for Imhoff or Maloof’s spouse. As a resulted, when Pearlstein sent Conte his subscription agreement it did not include the conditional repayment provisions that Antonoplos had offered to Conte and that Conte had accepted. No one noticed that this feature was not reflected in the subscription agreement prepared for Conte’s signature.
When Conte signed this draft subscription agreement on behalf of himself or any assignee, he and Shenghuo believed and intended that their contract included the same conditional repayment terms that had been added to the subscription agreements executed by Imhoff and Maloof’s spouse.
 
                                                            -16-
 
After Conte asked to revise his subscription agreement to indicate that Conte’s investment in Shenghuo was being made by GIUL rather than Conte individually, Pearlstein made that change in the version that he had previously sent to Conte and that Conte had already signed. As a result, the version of the subscription agreement that Conte accepted on GIUL’s behalf also did not include the conditional repayment “whereas” provisions that Conte and Shenghuo had agreed to.
The Court finds that the written subscription agreement that Conte signed in his own name, and the revised version in GIUL’s name that Conte accepted by causing GIUL to pay $64,000 to Shenghuo, were not fully integrated contracts. Whether a written contract is fully integrated “is ‘a question of fact [that] turns upon the intention of the parties.’ ”[10] Although the subscription agreement signed by Conte includes a clause stating that it represents the parties’ entire agreement and “supersedes any other writing or conversation,” the Court finds that in fact the parties intended that their agreement would include additional provisions, and that as a result the written form of their subscription agreement was not a fully-integrated contract.[11]
More specifically, the Court finds that Conte and Shenghuo both understood and had agreed that the conditional repayment provisions—stating that Conte’s or GIULR’s investment would be repaid in full “but solely through monies received for that purpose from GTI” and also that Conte or GIUL would retain their membership units in Shenghuo whether their investment was repaid “solely through monies received for that purpose from GTI” or not— were part of their contract, even though inadvertently they had not been
 
--------------------------------------------
 
[10] Green v. Harvard Vanguard Med. Associates, Inc., 79 Mass. App. Ct. 1, 9 (2011), quoting Holmes Realty Trust v. Granite City Storage Co., 25 Mass. App. Ct. 272, 275 (1988).
[11] “[E]ven apparently straightforward contractual language asserting integration will not always compel a conclusion that a writing reflects a complete and integrated agreement.” Green, 79 Mass. App. Ct. at 9. “Put differently, although such a clause is evidence of integration …, it is not conclusive on the question.” Chambers v. Gold Medal Bakery, Inc., 83 Mass. App. Ct. 234, 243 (2013). Thus, if a party has “raised sufficient doubt about the intended meaning of [an] integration clause,” then the trial judge should allow “evidence of the parties' negotiations and circumstances surrounding the execution of the [contract] to determine if [it] was an integrated agreement.” Chambers, 83 Mass. App. Ct.  at 244.
 
                                                            -17-
 
included in the written subscription agreements that Conte signed for himself and then accepted on GIUL’s behalf.[12]
In sum, the Court finds that the conditional repayment provisions sought by Conte, in the form previously shown to Conte and included in the final subscription agreements signed by Imhoff and Maloof’s spouse, were included in and part of the subscription agreement between GIUL and Shenghuo even though those two paragraphs were inadvertently omitted from the final written contract.
In July 2021, Shenghuo offered to revise its written subscription agreement with GIUL to include in writing the conditional repayment provision that was agreed to by the parties but had inadvertently been omitted from the final form of the document that Conte accepted on behalf of GIUL. That offer was consistent with the contract terms that Shenghuo had previously offered to Conte, and that Conte had accepted on GIUL’s behalf. Conte was aware of but never responded to this proposal to correct the written form of GIUL’s subscription agreement.
2.2.5. Faupel Played No Role, and Pearlstein Play a Very Limited Role, in GIUL’s Investment. Faupel had no conversations or other direct communications or contact with Conte before he agreed to invest and then caused GIUL to invest in Shenghuo. The Court does not credit Conte’s testimony that he had a brief three-way conversation with Antonoplos and Faupel before Conte decided to invest in Shenghuo.
During 2016, Faupel was acting as Shenghuo’s agent in China, as he worked to identify a Chinese partner who could help to commercialize the LuViva product in that country. But Faupel never acted as Shenghuo’s agent in connection with any potential investment by Conte or GIUL. Faupel was not involved in deciding what terms to offer to Conte; that was decided by Shenghuo’s Managing Members at that time, i.e. by Antonoplos and Blumberg. Nor was Faupel a de facto manager or otherwise exercise control over Shenghuo during 2016. Instead, the company was being run by its two Managing Members, Antonoplos and Blumberg.
Pearlstein’s communications with Conte prior to GIUL’s investment were limited to those described above. Pearlstein never did anything to help solicit
 
--------------------------------------------
 
[12]      Cf. Antonellis v. Northgate Const. Corp., 362 Mass. 847, 849–851 (1973); Ryder v.
Williams, 29 Mass. App. Ct. 146, 149–150 (1990).
 
                                                            -18-
 
an investment in Shenghuo by Conte or GIUL. His only role was to perform traditional legal work in connection with the transaction; he prepared and sent proposed solicitation agreements to Conte, and tried to obtain signatures on those contracts by Conte and by the two Managing Members of Shenghuo, Antonoplos and Blumberg.
Neither Faupel nor Pearlstein exercised any control over Shenghuo, or over Shenghuo’s Managing Members, at any time before GIUL made its investment in Shenghuo in July 2016. Later on, in March 2017, Antonoplos resigned as Managing Member of Shenghuo, Blumberg continued in that position and Faupel and Pearlstein joined him as Managing Members of Shenghuo. Faupel resigned from that position in early 2018, around February of that year.
2.3. Subsequent Events, After GIUL’s Investment in Shenghuo.
2.3.1. Shenghuo’s Investment in GTI. Once Shenghuo received the investments by Imhoff, Maloof’s spouse, Faupel, and GIUL, Shenghuo paid over $200,000 to GTI and thereby activated its rights under its licensing agreement with GTI. Shenghuo made this investment in its own name; it did not arrange for a consortium of investors to do so. Shenghuo made this payment to GTI in late July 2016.
2.3.2. No Repayments to Shenghuo or to GIUL. GTI’s efforts to raise additional capital from mid-2016 through early 2017 were not successful. Though the S-1 filed by GTI on July 1, 2016, was renewed several times, all efforts by GTI’s investment banker to raise funds for the company failed.
Since GTI had failed to raise at least $1 million from another source by the end of 2019, it was not obligated to and did not repay any part of or pay any interest on Shenghuo’s $200,000 investment in GTI.
And since Shenghuo never received repayment from GTI, it was not obligated to and never did repay any part of or pay any interest on GIUL’s $64,000 investment in Shenghuo.
2.3.3. Shenghuo’s Exchange Agreement with GTI. As late as mid-2019, GTI sincerely believed that it would be able to secure new finding and then be obligated and able to repay Shenghuo. In early June 2019, GTI’s CEO Dr. Gene Cartwright sent an email to Conte, copying Conte’s lawyer (Attorney Michael Gilleran) and Dr. Faupel, in which Cartwright again assured Conte that GTI was obligated to repay Shenghuo if GTI was able to raise at least $1 million in
 
                                                            -19-
 
funding from another source, and assuring Conte that GTI was “in the end stages of completing a financing for the Company of >$1 million.”
By late 2019, however, GTI was suffering a severe cash-flow crisis. GTI’s continued efforts to secure additional financing had failed. As a result, it was unable to pay all of its bills; GTI could not even pay for heat and lighting.
GTI concluded, and Shenghuo agreed, that GTI would not survive without raising substantial additional capital. At that time, GTI had considerable debt. GTI determined that it would not be able to raise additional capital unless it was able to eliminate its existing debt, as it had become clear to GTI that no new investor would be willing to invest in GTI only to have that money go to pay existing creditors rather than fund future company operations.
In early January 2020, Blumberg and Pearlstein—who at that time were the only remaining Managing Members of Shenghuo—concluded that it was in the best interest of Shenghuo to enter into an Exchange Agreement with GTI, under which Shenghuo’s loan to GTI would be converted to an equity interest. They believed and concluded that Shenghuo’s success was wholly dependent on GTI being successful; that if GTI were to fail then Shenghuo would have been worthless, because it would not be able to sell the LuViva product and would have no prospect of generating any income; that GTI would fail if it was not able to raise more working capital; and that GTI could not raise more capital unless Shenghuo and GTI’s other lenders agreed to exchange their rights as lenders for an ownership share in GTI. The Court finds that these conclusions were a reasonable exercise of business judgment.
Shenghuo therefore agreed to enter into an Exchange Agreement with GTI, with an effective date of December 30, 2019. This agreement had the effect of extinguishing GTI’s debt to Shenghuo, by exchanging that debt for shares of stock in GTI. The decision by Blumberg and Pearlstein to have Shenghuo enter into this Exchange Agreement was also a reasonable exercise of business judgment.
The Exchange Agreement between Shenghuo and GTI did not terminate GIUL’s conditional right to repayment by Shenghuo. But by eliminating GTI’s obligation to repay Shenghuo, and thereby ensuring that Shenghuo would never receive any repayment from GTI, it meant that the condition under which Shenghuo would have to repay GIUL would never be triggered.
 
                                                            -20-
 
Conte and GIUL were never promised and never had any right to participate in Shenghuo’s business decision as to whether Shenghuo should convert its conditional loan to GTI into an equity stake in GTI.
2.3.4. Current Status of GIUL’s Investment in Shenghuo. GIUL continues to hold its almost 11 percent ownership interest in Shenghuo, which in turn holds an ownership interest in GTI. The Court credits Blumberg’s unchallenged opinion that GTI has become very valuable. This suggests that GIUL’s ownership interest in Shenghuo also has real current and likely future value.
2.4. No Material Omissions. In its post-trial memorandum, GIUL contends that Shenghuo and some or all of the individual defendants withheld six categories of material information from Conte before he caused GIUL to invest in Shenghuo. The Court finds that GIUL has not proved any of these contentions.
2.4.1. Granting GIUL a Conditional Repayment Right. First, GIUL contends that the defendants never intended to provide Conte or GIUL with any conditional repayment right, or never intended Conte or GIUL to be able to exercise such a right, and yet never disclosed that intent. These assertions cannot be squared with the facts.
As discussed in § 2.2.4 above, Antonoplos, Blumberg, and Pearlstein always intended that Conte’s or GIUL’s subscription agreement with Shenghuo would include the conditional repayment feature. (As discussed in § 2.2.5, Faupel had nothing to do with these discussions and negotiations.) And the Court has found that the conditional repayment terms always were and remain part of GIUL’s subscription agreement with Shenghuo, even though they were inadvertently omitted from the final forms of the agreement the Pearlstein sent to Conte for his signature.
The Court further finds until late 2019, just before Shenghuo entered into its Exchange Agreement with GTI, all defendants intended that GIUL would be able to exercise its conditional repayment rights, subject to the condition (that Conte understood and accepted at the time) that GTI obtain at least $1 million in financing from another source and therefore repay Shenghuo.
The Court finds that when Antonoplos was trying to convince Conte to invest in Shenghuo, he (Antonoplos), Blumberg, Faupel, and Shenghuo all expected that GTI was likely to be successful in raising at least $1 million in additional
 
                                                            -21-
 
financing within the next three to six months, and expected that when GTI did so it would repay Shenghuo in accord with its licensing agreement.
It further finds that, while Antonoplos was soliciting Conte to invest in Shenghuo, Pearlstein exercised no control over Shenghuo or its managing members, and that Pearlstein had no knowledge of any made no representations to Conte or GIUL about the likelihood that GTI would repay Shenghuo and therefore trigger GIUL’s conditional right to repayment from Shenghuo.
The Court finds that Shenghuo and all four individual defendants always intended that if GTI were to repay Shenghuo’s investment in GTI, then Shenghuo would live up to its conditional agreement to repay GIUL’s investment in Shenghuo with the agreed-upon interest.
2.4.2. Conversion of Shenghuo’s Loan to GTI. Second, GIUL contends that no one told Conte in advance that Shenghuo’s Managing Members, and not Conte or GIUL, would make any future decision by Shenghuo to exchange its loan to GTI for shares in GTI.
The Court finds that no such disclosure was required because Conte knew, and any reasonable investor in Conte’s position would have known, that Conte and GIUL would have no control over any of Shenghuo’s business decisions. When Conte agreed to the terms in the specimen subscription agreement (including the conditional repayment provision), he understood that Shenghuo would be controlled by its Managing Members, that Conte or GIUL were not going to be Managing Members of Shenghuo, and that Conte or GIUL were going to be minority owners with no right or ability to control Shenghuo.
Furthermore, Conte was never offered, promised, or given any right to convert GIUL’s conditional right to be repaid by Shenghuo into an ownership interest in GTI, which was a wholly separate business entity. To the extent that GIUL now contends that it had such a right, and that Shenghuo’s Exchange Agreement with GTI deprived GIUL of that conversion right, that contention cannot be squared with the facts; GIUL was never promised, never had, and was never deprived of that non-existent right.
2.4.3. GTI’s Financial Condition. Third, GIUL contends that GTI’s financial condition before GIUL invested in Shenghuo was never disclosed. That is incorrect.
 
                                                            -22-
 
As the Court found in § 2.2.1 above, Antonoplos told Conte to go to GTI’s website for more detailed information about that entity, Antonoplos provided Conte with a link to GTI’s website, if Conte had done as Antonoplos suggested he could easily have accessed GTI’s most recent 10-K and 10-Q filings with the SECs, and those filings explained GTI’s financial and business condition in some detail. It appears that Conte did not bother to read the disclosures that had been provided to him. But he has not shown that any material information about GTI was withheld from him.
2.4.4. Shenghuo’s Financial Condition and Business Model. Fourth, GIUL contends that no one ever told him that as of June 2016 Shenghuo “had no sales, approvals, products, partners, or manufacturer or manufacturing expertise, and that its only real assert was its License Agreement with Guided” (meaning GTI). None of that is correct.
The Court finds that Antonoplos clearly disclosed all of those things to Conte before he invested in Shenghuo on behalf of GIUL. It does not credit Conte’s testimony to the contrary.
2.4.5. Role of GTI’s Investment Banker. Fifth, GIUL complains that it never learned that the investment banker working with GTI as of June 2016 was not promising to invest its own funds in the company but instead would be seeking funds on GTI’s behalf from other investors.
The Court finds that GIUL has not shown, and indeed has presented no evidence suggesting, that a reasonable investor deciding whether to invest in Shenghuo would have viewed this information as significantly altering the total mix of information made available. Investment banks often act as an intermediary between a company seeking to raise funds and investors will to loan money to or make an equity investment in the company. Though investment banks may sometimes invest their own funds, GIUL has not shown that a reasonable investor would have considered the fact that GTI’s investment broker was acting solely as a potential intermediary to be material to any decision as to whether to invest in Shenghuo.
These findings do not turn on, but are corroborated by, the disclosures in GTI’s 10-K filing for 2015, which the Court discussed and took judicial notice of in § 2.2.1 above. As noted above, this 10-K disclosed that GTI had to raise additional funds, and warned potential investors that “there is no assurance that such funds can be raised on terms that we would find acceptable, on a
 
                                                            -23-
 
timely basis, or at all.” A further disclosure that GTI had hired an investment banker to solicit funding from other investors, but that the investment banker had not committed to investing any of its own money in GTI, would not have significantly altered the total mix of information made available, in light of GTI’s explicit warning that its efforts to raise more funding may fail.
2.4.6. Repayment to GIUL Conditioned on GTI Raising $1 million. Finally, GIUL contends that no one ever told Conte that any payback from GTI to Shenghuo (and thus any payback from Shenghuo to GIUL) was conditioned on GTI raising $1 million in funding from another source. That is not true.
As discussed in §§ 2.2.1 and 2.2.3 above, the Court credits Antonoplos’ testimony on cross-examination that he told Conte that repayment of the final $64,000 investment was contingent on GTI raising an additional $1 million, and credits Conte’s explicit admissions in his February 2018 emails that Conte agreed to invest in Shenghuo only after being promised that his initial investment would be repaid with interest “upon [GTI] raising the first $1 Million in financing,” and that this promise “is what induced” him to make GIUL’s $64,000 investment.
The Court does not credit any of Conte’s contrary testimony at trial.
3. Analysis and Conclusions. GIUL has not met its burden of proving either of its remaining claims against any of the defendants.
3.1. MUSA Claim. First, GIUL has not shown that any of the defendants violated the Massachusetts Uniform Securities Act.
3.1.1. Legal Background. MUSA imposes primary liability on anyone who “offers or sells a security” by means of a material false statement or omission. See G.L. c. 110A, § 410(a)(2). The statute also imposes secondary liability upon any person “who directly or indirectly controls” a seller that violates § 410(a) (a so-called “control person”), and upon any “agent who materially aids in” such a sale. See G.L. c. 110A, § 410(b).
3.1.1.1. Primary Liability under § 410(a). To prevail on a claim under § 410(a), a plaintiff must prove that: “(1) the defendant ‘offers or sells a security”; (2) in Massachusetts; (3) by making ‘any untrue statement of a material fact’ or by omitting to state a material fact; (4) the plaintiff did not know of the untruth or omission; and (5) the defendant knew, or ‘in the exercise of reasonable care [would] have known,’ of the untruth or omission” (bracketed word in original).
 
                                                            -24-
 
Marram v. Kobrick Offshore Fund, Ltd., 442 Mass. 43, 52 (2004), quoting  G.L.     c. 110A, § 410(a)(2).
Someone sells or offers a security within the meaning of § 410(a) if they pass or transfer title to or other interest in the security, or if they make an offer to sell or actively solicit an offer to purchase a security. See Pinter v. Dahl, 486 U.S. 622, 642–646 (1988).[13] Others who may play some other role in marketing or selling a security cannot be held liable under this provision, even if their participation was “a substantial factor in causing the transaction to take place.” Id. at 649– 650. In other words, “[p]roof the defendant caused a plaintiff’s purchase of a security is not enough to establish that the defendant ‘solicited’ the sale.” See Shaw v. Digital Equip. Corp., 82 F.3d 1194, 1215 (1st Cir. 1996) (emphasis in original, applying Pinter).[14]
3.1.1.2. Secondary Liability under § 410(b). There are two possible ways to prove secondary liability under MUSA, either by proving that someone controlled an entity that made a fraudulent offer or sale of a security, or by proving that they acted as an agent of the offeror or seller and materially aided the sale.
To prove that someone is liable for securities fraud as a control person under MUSA § 410(b), a plaintiff “must prove ‘(1) that a primary violator violated the
 
--------------------------------------------
 
[13] Since MUSA “is almost identical with” parallel provisions in the Federal Securities Act of 1933, Pinter and other decisions and commentary construing the federal statute provides useful guidance on how to construe and apply MUSA. Marram, 442 Mass. at 50-51. As a result, when the Court cites or discusses federal case law construing and applying the Federal Securities Act, it will treat that precedent as if it were construing and applying MUSA, and will not each time note that the Federal decision concerns the Federal statute.
[14] That is because one who offers or sells a security by means of a material misrepresentation is only “liable to the person buying the security from him.” G.L. c. 110A, § 410(a)(2). This “purchase from” requirement “focuses on the defendant’s relationship with the plaintiff-purchaser;” it is therefore materially different than the substantial-factor test, which “focuses on the defendant’s degree of involvement in the securities transaction and its surrounding circumstances.” Pinter, supra, at 651. Thus, potential liability under § 410(a) is limited to those “who pass title” to a security and other “persons who ‘offer,’ including those who ‘solicit’ offers.” Cambridge Place Inv. Mgmt., Inc. v. Morgan Stanley & Co., 1084CV02741-BLS1, 2012 WL 5351233, at *24 (Mass. Super. Sept. 28, 2012) (Billings, J.) (quoting Pinter, supra, at 650, and applying Pinter to MUSA).
 
                                                            -25-
 
federal securities laws; (2) that the alleged control person actually exercised control over the general operations of the primary violator; and (3) that the alleged control person possessed—but did not necessarily exercise—the power to determine the specific acts or omissions upon which the underlying violation is predicated.’ ” Donelson v. Ameriprise Fin. Servs., Inc., 999 F.3d 1080, 1093–1094 (8th Cir. 2021), quoting Lustgraaf v. Behrens, 619 F.3d 867, 873 (8th Cir. 2010); see also In re Stone & Webster, Inc., Securities Litigation, 414 F.3d 187, 194 (1st Cir. 2005); In re Lehman Bros. Mortgage-Backed Securities Litigation, 650 F.3d 167, 185
(2d Cir. 2011).
“To meet the control element, the alleged controlling person must not only have the general power to control the company, but must also actually exercise control over the company.” Aldridge v. A.T. Cross Corp., 284 F.3d 72, 85 (1st Cir. 2002); accord, e.g., Commodity Futures Trading Comm’n v. Baragosh, 278 F.3d 319, 330 (4th Cir. 2002); Donohoe v. Consolidated Operating & Production Corp., 30 F.3d 907, 911–912 (7th Cir. 1994); Lustgraaf v. Behrens, 619 F.3d 867, 873–874 (8th Cir. 2010); Varjebedian v. Emulex Corp., 888 F.3d 399, 403 n.2 (9th Cir. 2018); In re Galectin Therapeutics, Inc. Securities Litigation, 843 F.3d 1257, 1276 (11th Cir. 2016).
Secondary liability may also be imposed upon an “agent who materially aids in the sale,” unless the agent proves that they “did not know, and in the exercise of reasonable care could not have known, of the existence of the facts by reason of which the liability is alleged to exist.” G.L. c. 110A, § 410(b).
3.1.1.3. Materiality of False Statement or Omission. Under MUSA, “[t]he test whether a statement or omission is material is objective: ‘there must be a substantial likelihood that the disclosure of the omitted fact would have been viewed by the reasonable investor as having significantly altered the “total mix” of information made available.’ ” Marram, 442 Mass. at 57–58, quoting Craftmatic Sec. Litig. v. Kraftsow, 890 F.2d 628, 641 (3d Cir. 1989).
3.1.1.4. Remedy. If a security is offered or sold in violation of MUSA, and liability attaches under § 410(a) or § 410(b), the purchaser is entitled to tender the security to the liable party or parties and recover from them an amount equal to the entire consideration that the purchaser paid for the security, plus six percent annual interest running from the date they made that payment, plus litigation costs and reasonable attorneys’ fees. See Id., § 410(a)(2).
                                                            -25-
 
“While not imposing strict liability on the seller for untrue statements or omissions,” MUSA provides that if an investor proves that securities were sold by means of such misrepresentations then burden shifts to the seller to prove “ ‘that he did not know, and in the exercise of reasonable care could not have known, of the untruth or omission.’ ” Marram, supra, at 52, quoting § 410(a)(2).
This statute “creates a strong incentive for sellers of securities to disclose fully all material facts about the security,” and “provides strong protections for a buyer who received misleading information from a seller of securities.” Marram, 442 Mass. at 51–52. It does so by “rendering tainted transactions voidable at the option of the defrauded purchaser,” without the purchaser having to prove that the misrepresentation caused them to suffer any loss or even that they relied upon the misrepresentation when they bought the security. Id. at 51, 53, 57 n.24. “The buyer’s sophistication is also irrelevant.” Id. at 53.
MUSA “seeks not only to secure accuracy in the information that is volunteered to investors, but also, and perhaps more especially to compel disclosure of significant matters that were heretofore rarely, if ever, disclosed.” Marram, supra, at 51-52, quoting Shulman, Civil Liability and the Securities Act, 43 Yale L.J. 227, 227 (1933). MUSA imposes a duty of full disclosure on sellers of securities; the buyer has no “duty to investigate or to ‘verify a statement’s accuracy.’ ” Id. at 53, quoting Mid-America Fed. Sav. & Loan Ass’n v. Shearson/American Express Inc., 886 F.2d 1249, 1256 (10th Cir. 1989).
3.1.2. MUSA Claim against Shenghuo, Antonoplos, and Blumberg. GIUL proved several elements of its MUSA claim against Shenghuo, Antonoplos, and Blumberg. But this claim still fails because GIUL has not proved that these defendants offered or sold any security by making ‘any untrue statement of a material fact’ or by omitting to state a material fact. See G.L. c. 110A, § 410(a).
3.1.2.1. Status as Sellers, Offerors, or Control Persons. The Court concludes that Shenghuo faces potential MUSA liability because it sold a security to GIUL in Massachusetts, Antonoplos faces potential primary liability because he offered a security to GIUL, and Antonoplos and Blumberg both face potential primary liability because they passed sold securities by signing Conte’s subscription agreement and in any case face potential secondary liability because they were the Managing Members of and thus exercised control over Shenghuo at the time that it sold a security to GIUL.
 
                                                            -27-
 
GIUL’s purchase of an ownership interest in Shenghuo together with a conditional right of repayment constituted the purchase of a “security” within the meaning of MUSA. The statute defines the term “security” broadly. It includes, among other things, any “evidence of indebtedness,” any “investment contract,” and any interest commonly known as a security. See G.L. c. 110A, § 401(k).
Antonoplos participated in “offering” the sale of a security to GIUL by actively soliciting Conte’s investment in Shenghuo. MUSA defines “offer” broadly, to include “every attempt or offer to dispose of, or solicitation of an offer to buy, a security or interest in a security for value.” G.L. c. 110A, § 401(i)(2). Under this definition, “offers ‘are not limited to communications which constitute an offer in the common law contract sense, or which on their face purport to offer a security. Rather, … they include “any document [or oral communication] which is designed to procure orders for a security.” ’ ” Bulldog Investors General Partnership v. Secretary of the Commonwealth, 460 Mass. 647, 653 (2011) (construing identical provision of federal 1933 act), quoting Matter of Carl M. Loeb, Rhodes & Co., 38 S.E.C. 843, 848 (1959), quoting in turn Security Act Release No. 2623 (July 25, 1941).
Antonoplos and Blumberg also face potential liability as sellers of securities. They both signed Conte’s original subscription agreement and agreed to sign the revised subscription agreement in GIUL’s name. Since Antonoplos and Blumberg were the ones who passed title or other interest in the Shenghuo security to GIUL, they can be held liable as sellers of the security. See Pinter, 486 U.S. at 642.
And both Antonoplos and Blumberg also face potential MUSA liability as “control persons” because, as the two Managing Members of the company, they “actually exercised control over the general operations” of Shenghuo and had the power to determine the contours of the offer to Conte and what information was shared with him. Cf. Donelson, 999 F.3d at 1093–1094.
3.1.2.2. No False Statement or Material Omission. GIUL has failed, however, to prove that it was offered or sold any security by means of a material false statement or omission. 
GIUL’s contention that he relied on false promises is without merit. Shenghuo and its Managing Members in 2016 (Antonoplos and Blumberg) did not make a false promise that Conte or GIUL would receive the same conditional
 
                                                            -28-
 
repayment right that had been offered to prior investors. To the contrary, as the Court found in § 2.2.3 and § 2.2.4 above, those conditional payment terms became part of GIUL’s subscription agreement with Shenghuo even though they were inadvertently omitted from the final documents provided to Conte.
The defendants also did not make a false promise that Shenghuo would honor GIUL’s conditional repayment right, if the condition that GTI raise $1 million in funding from other sources and therefore repay Shenghuo were satisfied. The Court has found in § 2.2.3 above that Antonoplos, Blumberg, and thus Shenghuo reasonably expected in June and July 2016 (when Conte was deciding whether to invest in Shenghuo) that GTI would likely repay Shenghuo by the end of 2016, and that these defendants fully intended that Shenghuo would then promptly repay Conte’s or GIUL’s investment with interest.
Although circumstances later changed, and Shenghuo was convinced three- and-a-half years later (at the end of 2019 or beginning of 2020) to forego its right to repayment by GTI in exchange for being granted an equity interest in GTI— which meant that the condition triggering GIUL’s right to repayment by Shenghuo would never occur—does not establish that defendants made a false promise to Conte and Shenghuo in mid-2016. An “intention not to perform a promise … cannot be shown merely by [subsequent] nonperformance of the promise.” Galotti v. United States Trust Co., 335 Mass. 496, 501 (1957); accord McCartin v. Westlake, 36 Mass. App. Ct. 221, 230 n.11 (1994).
GIUL’s contention that Shenghuo, Antonoplos, and Blumberg failed to disclose that GTI’s finances were shaky, and that it could not seek without an infusion of new funding, is also without merit. As discussed in § 2.2.1 and § 2.4.3 above, Antonoplos told Conte to look at GTI’s website for more information about the company, Antonoplos provided Conte with a link to GTI’s website. If Conte had gone to that resource he could have easily accessed and been able to review GTI’s filings with the SEC in which GTI fully disclosed its financial and business prospects and its need for additional funding. Where a public corporation discloses that it is grappling with serious and ongoing financial problems in its 10-K and 10-Q filings with the SEC, “no reasonable investor could have been misled into believing’ that the corporation’s “financial health was anything more than tenuous.” J & R Marketing, SEP v. General Motors Corp., 549 F.3d 384, 395–396 (6th Cir. 2008).
 
                                                            -29-
 
Finally, in the rest of § 2.4 above, the Court details its findings that the Shenghuo defendants did not withhold any other material information from Conte. The Court finds and concludes that GIUL has not shown that the defendants made any other false statements to him or withheld any other material information from him.
3.1.3. MUSA Claim against Faupel and Pearlstein. GIUL has failed to establish that Faupel or Pearlstein face even potential primary or secondary liability under MUSA.
The Court has found that Faupel had no communications with Conte before Conte invested in Shenghuo on behalf of GIUL. Faupel cannot be held primarily liable under MUSA because he had no involvement in making an offer to sell a security to GIUL or in soliciting an offer to purchase any security by GIUL, and did nothing to pass or transfer to GIUL any title to or other interest in any security. Cf. Pinter, 486 U.S. at 642–646. He cannot be held secondarily liable as a control person, because the Court has found that during 2016 Faupel did not have legal control over Shenghuo and did nothing to exercise control over Shenghuo. See Aldridge, 284 F.3d at 85.
Finally, although Faupel was acting as Shenghuo’s agent during 2016 in trying to identify a commercial partner in China, he cannot be held secondarily liable as an agent because he did nothing to materially aid Shenghuo’s sale of a security to GIUL. See G.L. c. 110A, § 410(b); San Francisco Residence Club, Inc. v. Baswell-Guthrie, 897 F.Supp.2d 1122, 1185–1189 (N.D. Ala. 2012) (seller’s agent who did not “materially aid” in unlawful sale of securities not liable under similar State Blue Sky law); accord Brown v. Earthboard Sports USA, Inc., 481 F.3d 901, 922 (6th Cir. 2007); Atlanta Skin & Cancer Clinic, P.C. v. Hallmark General Partners, Inc., 463 S.E.2d 600, 117–118 (S.C. 1995). That Faupel was Shenghuo’s agent for purposes unrelated to GIUL’s investment is irrelevant.
Pearlstein cannot be held primarily liable under MUSA either. He had no involvement in make an offer to sell a security to GIUL or soliciting an offer by GIUL to invest in Shenghuo. Antonoplos and Blumberg, as Shenghuo’s Managing Members, were the ones who transferred title or interest in Shenghuo to GIUL; Pearlstein did not. Though Pearlstein prepared the Conte and GIUL subscription agreement, and was involved in the mechanics of closing that transaction, that does not subject him to primary liability. See Pinter, supra, at 649–650.
 
                                                            -30-
 
Like Faupel, Pearlstein had no legal control and did nothing to exercise control over Shenghuo in 2016, so he also cannot be held secondarily liable as a control person.
Finally, although Pearlstein was acting as Shenghuo’s legal counsel in connection with GIUL’s investment, by drafting and trying to arrange for executing of GIUL’s subscription agreement, that limited role as agent for Shenghuo cannot subject Pearlstein to secondary liability. An attorney performing traditional legal work like drafting or revising a subscription agreement does not “materially aid” the sale of securities for the purposes of so-called Blue Sky statutes like MUSA. See, e.g., Batson v. RIM San Antonio Acquisition, LLC, 2018 WL 1581675, at *8–*9 (S.D.N.Y. Mar. 27, 2018); Bennett v. Durham, 683 F.3d 734, 738–740 (6th Cir. 2012); San Francisco Residence Club, Inc. v. Baswell-Guthrie, supra; Ward v. Bullis, 748 N.W.2d 397, 405 (N.D. 2008); In re Infocure Securities Litigation, 210 F.Supp.2d 1331, 1364 (N.D. Ga. 2002); CFT Seaside Investment L.P. v. Hammet, 868 F.Supp. 836, 844 (D.S.C. 1994); Baker, Watts & Co. v. Miles & Stockbridge, 620 A.2d 356, 368 (Md. Ct. Special App. 1993).
3.2. Chapter 93A Claims. In addition, GIUL has also not shown that any of the defendants violated the Massachusetts Consumer Protection Act, G.L. c. 93A, § 11. Based on the findings and discussion above, the Court finds and concludes that none of the Defendants has committed any unfair or deceptive act or engaged in any unfair or deceptive practice that has harmed GIUL in any way.
The findings and discussion above show that none of the defendants violated c. 93A when Shenghuo was soliciting an investment by Conte or GIUL during 2016.
The Court finds that the subsequent decision in late 2019 or early 2020 by Blumberg and Pearlstein (who were then Shenghuo’s Managing Members) to enter into an agreement that exchanged Shenghuo’s loan to GTI for an equity interest in GTI was not unfair to GIUL, was not deceptive, and also did not violate c. 93A. As discussed in § 2.3.3 above, this was a reasonable exercise of business judgment. Blumberg and Pearlstein reasonably concluded that agreeing to this exchange was in the best interests of Shenghuo, and therefore in the best interests of Shenghuo’s members.
GIUL may disagree with the decision and believe that it was a big mistake. But making a mistake of business judgment does not implicate c. 93A. “[A] violation of G.L. c. 93A requires, at the very least, more than a finding of mere
 
                                                            -31-
 
negligence.” Boyle v. Zurich American Ins. Co., 472 Mass. 649, 662 (2015), quoting Darviris v. Petros, 442 Mass. 274, 278 (2004). Thus, “a negligent miscalculation” that involved no intentional deceit or negligent misrepresentation does not violate c. 93A. Id. In other words, if a business entity or any of its principals “acts in good faith” and exercises “its honest business judgment,” it cannot be held liable under c. 93A. See Bolden v. O’Connor Café of Worcester, Inc., 50 Mass. App. Ct. 56, 67 (2000), quoting Peckham v. Continental Cas. Ins. Co., 895 F.2d 830, 835 (1st Cir. 1990).
ORDER
Final judgment in this case shall enter providing as follows:
This case having come before the Court and the issues having been duly heard and decided, first on a motion for judgment on the pleadings, then on motions for summary judgment, and finally after a non-jury trial on Plaintiff’s remaining claims under G.L. c. 110A, § 410, and G.L. c. 93A, § 11, it is hereby declared, ordered, and adjudged that Plaintiff GIUL, LLC, shall take nothing on any of its claims.